2013 OK CR 1

**Ricky Ray MALONE, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. D–2010–1084.**

Court of Criminal Appeals of Oklahoma.

Jan. 11, 2013.

Gary Henry, Matthew Haire, Capital Trial Division, Oklahoma Indigent Defense System, Norman, OK, for Defendant.

Fred Smith, District Attorney, Comanche County Courthouse, Lawton, OK, for the State.

Lee Ann Jones Peters, James H. Lockard, Homicide–Direct Appeals Division, Oklahoma Indigent Defense System, Norman, OK, for Appellant.

E. Scott Pruitt, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, for the State.

## OPINION

LUMPKIN, Judge.

¶ 1 Appellant, Ricky Ray Malone, was tried by jury and convicted of First Degree Murder (21 O.S.2001, § 701.7) in the District Court of Comanche County, Case Number CF–2005–147. In accordance with the jury's recommendation, the trial court imposed a sentence of death. This Court affirmed Appellant's conviction, but reversed the sentence and remanded the case for resentencing. *Malone v. State,* 2007 OK CR 34, 168 P.3d 185.

¶ 2 Appellant waived his right to jury trial and a resentencing trial was held October 18–29, 2010, before the Honorable Mark R. Smith.[1] The trial court found the existence of two (2) aggravating circumstances: (1) "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (2) "the victim of the murder was a peace officer ..., and such person was killed while in performance of official duty." 21 O.S.2001, § 701.12.[2] The trial court further found that the aggravating cir-

---

1. As noted in this Court's opinion on direct appeal, the killing of Trooper Nikky J. Green was committed in Cotton County. Appellant was initially charged in Cotton County District Court but venue was transferred to Comanche County following the State's confession of Appellant's change of venue motion so that the State could achieve an earlier trial date. *Malone v. State,* 2007 OK CR 34, ¶ 1 n. 1, 168 P.3d 185, 189 n. 1.

2. The trial court rejected the aggravating circumstance of "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." 21 O.S.2001, § 701.12(7).

cumstances outweighed the mitigating circumstances presented and sentenced Appellant to death. Appellant now appeals this sentence.

## FACTS

¶ 3 In the late night hours of December 25, 2003, Appellant took his sister's car to a county road in rural Cotton County just east of Devol, Oklahoma.[3] He set up a methamphetamine laboratory and started cooking methamphetamine. Appellant's four meth-making comrades, Tammy Sturdevant (Appellant's sister), Tyson Anthony (her boyfriend), James Rosser and Jamie Rosser (husband and wife) had gathered all of the ingredients necessary to make methamphetamine and loaded them in the car earlier in the day. Appellant went to complete the cook alone because Anthony became ill and stayed behind.

¶ 4 Before Appellant left he asked Anthony if he could borrow his 9mm pistol in case he got pulled over or had trouble with the police. Anthony understood that Appellant wanted the pistol so he could shoot and kill any officer that tried to take him to jail. Appellant had been arrested for possession of methamphetamine on November 10, 2003. On December 21, 2003, he was arrested for conspiracy to manufacture methamphetamine. Following those arrests, Appellant explained to Anthony and his other meth-making comrades that he could not go back to jail because he would be unable to bond out. He threatened that he would shoot and kill the officers before he went back to jail.

¶ 5 Appellant had the lab set up on the ground outside the white four-door car. As the chemicals processed, Appellant fell asleep in the front seat. At 6:20 a.m., the local newspaper delivery person, Abigail Robles, discovered Appellant. Fearing that he was dead, Robles contacted a family friend that lived nearby. Robles traveled to Trooper Nik Green's home and woke him. Green was not scheduled to be on duty until 9:00 a.m. on that date so he reported the circumstances to the Oklahoma Highway Patrol dispatch.

When Green learned that no one else was available, he volunteered to enter service early and check out the situation. Trooper Green went on duty at 6:37 a.m., and shortly thereafter he informed dispatch that he had discovered the white car.

¶ 6 Green's patrol unit was clearly marked as an official Oklahoma Highway Patrol car. Green pulled-up behind the white four-door car. His headlights illuminated the vehicle and the ground around the car. Apparently, Green observed the items on the ground and identified them as a meth lab.

¶ 7 Trooper Green was dressed in his OHP brown uniform. He contacted Appellant in the front seat of the car. Green woke Appellant by shining his flashlight and speaking to him. Green informed Appellant he was under arrest. Green had Appellant exit the car and got him face-first on the ground in front of the patrol unit. Green handcuffed Appellant's right wrist. Appellant got up and started fighting Green. Appellant later told his meth-making comrades that he fought Green because he did not want to go back to jail.

¶ 8 A tremendous struggle ensued on the side of the road. Green dropped his service weapon during the fight and resorted to striking Appellant with his baton. Appellant lost the pistol that Anthony had loaned him. The two men fought down into a ditch, through a barb wire fence and back again into the ditch. During the struggle Appellant found Green's service weapon laying on the ground. This gave Appellant the upper hand. Appellant put the gun to Green's head and Green stopped struggling.

¶ 9 Appellant forced Trooper Green to lie face down in the ditch with his arms and legs spread out wide. Appellant was on top of Green so he could not get back up. Green told Appellant that he could run and leave him if he wanted. Green explained to Appellant that he had children and pleaded with him "[i]n the name of Jesus Christ." (Tr. 5B, 975).

3. The facts supporting Appellant's conviction were summarized in this Court's opinion on direct appeal, which is incorporated herein by reference. *See Malone*, 2007 OK CR 34, ¶¶ 2–19, 168 P.3d at 189–95.

¶ 10 Appellant repeatedly asked Green where the handcuff keys were at. When Green indicated that he did not know where the key was at, Appellant explained "[t]hen you'll die." (Tr. 5B, 977). Green continued to plead for Appellant not to harm him throughout the exchange. Appellant asked Green "[w]here did you drop your gun, at?"[4] Green pleaded "Don't shoot me." (Tr. 5b, 982). Appellant promised that he would not shoot Green. After several more requests for the keys, Green told Appellant that the keys were in his pocket. Appellant rolled Green slightly and searched his pocket. Green asked Appellant if he found the keys. When Appellant responded negatively, Green volunteered: "There's some more in my unit." Appellant stated, "I don't need to know." (Tr. 5B, 999).

¶ 11 Unable to find the handcuff keys or the other firearm, Appellant could not prevent the Trooper from taking further action after he left. Appellant decided to kill Trooper Green. Green recognized Appellant's thought process and began to pray. Appellant shot Green in the back of the head. Eleven seconds later, Appellant shot Green in the back of the head for the second time. Appellant cleaned up the meth lab, put the components in the car, and drove away.

¶ 12 Appellant drove directly to his sister's house. He told all four of his meth-making comrades: "I just killed [sic] an f'ing Hi–Po." (Tr. 5B, 1021, 1037). Appellant explained that he killed the cop to avoid going back to jail. Appellant's comrades helped him get rid of the car, the gun, and his clothes. Appellant apologized to each of the four. When he noticed that Jamie Rosser was upset the following evening, Appellant explained to her that he had gotten everything cleaned up and that he had left nothing to identify to him. Mrs. Rosser asked him about the patrol car video and Appellant responded "Oh, fuck." (Tr. 3, 143–44).

¶ 13 Based upon the dashcam video from Trooper Green's patrol unit, Appellant was quickly identified. The Oklahoma State Bureau of Investigation questioned Appellant about Trooper Green's murder. Appellant informed Agent Perry Unruh that Tyson Anthony's account of what had occurred was "probably true" but then claimed "maybe it was an accident." (Tr. 5B, 1045–49). When questioned further Appellant stated: "I can't, I can't say anything or I'll get the death penalty." (Tr. 4, 104).

## TRIAL ISSUES

¶ 14 Appellant contends in his second proposition of error that in two separate instances he was denied the effective assistance of counsel. This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Mitchell v. State*, 2011 OK CR 26, ¶ 139, 270 P.3d 160, 190. The *Strickland* test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense. *Bland v. State*, 2000 OK CR 11, ¶ 112, 4 P.3d 702, 730 (*citing Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064). Unless the appellant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Ryder v. State*, 2004 OK CR 2, ¶ 85, 83 P.3d 856, 875 (*quoting Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064).

¶ 15 The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* This Court has stated that the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall perform-

---

4. Appellant did not learn until later that he, in fact, had the Trooper's gun and not the firearm that he borrowed from Anthony.

ance. *Mitchell*, 2011 OK CR 26, ¶ 140, 270 P.3d at 190.

■ ¶ 16 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Phillips v. State*, 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043 (*citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069). To demonstrate prejudice an appellant must show that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. *Bland*, 2000 OK CR 11, ¶ 112, 4 P.3d at 731. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, — U.S. ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011).

■ ¶ 17 Appellant, first, claims that defense counsel rendered ineffective assistance by advising him to waive his right to have a jury determine his punishment.

■ ¶ 18 The Tenth Circuit Court of Appeals has determined that an attorney's decision to waive his client's right to jury trial is a classic example of strategic trial judgment for which *Strickland* requires that judicial scrutiny be highly deferential. *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n. 1 (10th Cir.2001). For counsel's advice in such circumstances to rise to the level of constitutional ineffectiveness, the decision to waive jury trial must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. *Id.* (quotations and citation omitted).

■ ¶ 19 We agree that an attorney's advice to a client to waive the right to jury trial is a strategic decision for which judicial scrutiny must be highly deferential. *See Dawkins v. State*, 2011 OK CR1, ¶ 20, 252 P.3d 214, 220 ("[W]e will not second-guess strategic decisions."). Regarding strategic decisions, *Strickland* provides:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690–691, 104 S.Ct. at 2066.

¶ 20 Turning to the record in the present case, the trial court held a hearing upon Appellant's waiver of his right to jury resentencing on October 8, 2010.[5] transcript of that proceeding reveals the circumstances of Appellant's jury waiver. On October 6, 2010, the local newspaper ran a story concerning Appellant's case. The writer, unknowingly, referenced State's evidence the Court had determined was inadmissible. The next day, the two attorneys and two investigators making up the defense team met with Appellant. They discussed whether Appellant should file a motion for a continuance or proceed with the jury trial scheduled the next week. This discussion evolved into a discussion of Appellant's right to jury resentencing and the possibility of Appellant taking the "unusual" step of waiving a jury and trying the matter to the judge assigned to the case. Appellant and his defense team extensively discussed the subject. The defense team did not try to influence Appellant one way or the other. Appellant was permitted to think about the matter overnight. He decided that a bench trial was the best thing for him. At the waiver hearing, defense counsel filed the motion for continuance in open court. The trial judge indicated that he would grant the motion if Appellant still wanted a jury trial. Appellant indicated that "strategically" a bench trial was his "best option" and waived his right to jury resentencing. (10/08/2010, Tr. 18–19).

5. We commend Judge Smith for his thoroughness in the determination that Appellant's waiver of jury resentencing was knowing and voluntary.

¶ 21 While the decision to waive jury trial was solely Appellant's decision, the record reflects that the waiver was a carefully crafted strategy developed by the defense team.[6] Defense counsel indicated during the waiver hearing that Appellant's defense team had worked together on Appellant's case for approximately three (3) years, including interviewing 230–some witnesses, to bring the best case they possibly could on Appellant's behalf. The defense team helped Appellant form the strategy of waiving his right to a jury for the resentencing proceeding. Counsel informed the court that they could not think of anything the defense team missed in trying to advise Appellant on how to handle the resentencing proceeding. Appellant spoke to each member of the defense team about the issues, had the advantage of their different viewpoints, and chose to pursue the bench trial strategy. It was the consensus of the defense team that Appellant's decision was "the best trial strategy that we could help him form and have helped him form throughout our time of representation with him." (10/08/2010, Tr. 30). As such, we find that counsels' advice to Appellant concerning the waiver of his right to jury resentencing was a thoroughly investigated strategic decision which is virtually unchallengeable.

¶ 22 Appellant contends that waiving jury trial in the present case was an unreasonable strategic choice. He argues that a capital sentencing decision is generally best left to a jury, that there was a better way of avoiding a jury tainted by the newspaper article, and the odds of convincing one merciful factfinder to spare his life were greater with a jury.[7] However, that is not the standard adopted by United States Supreme Court. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct.

770, 792, 178 L.Ed.2d 624 (2011). We reject Appellant's claim that defense counsel rendered ineffective assistance for allegedly failing to utilize the best practice or most common custom.

¶ 23 Appellant asserts that counsels' strategic decision was unreasonable because a poll allegedly indicated that the jury pool in Comanche County was receptive to a sentence less than death. Appellant cites to statistics within a Change of Venue Survey that defense counsel commissioned and attached to Appellant's Application for Change of Venue. Appellant mischaracterizes this poll. The survey did not collect data on the likelihood that a jury could be found in Comanche County who would impose a sentence less than death. Instead, the survey was "focused on gauging how familiar the respondents were with the case in general, and, more specifically, with the criminal allegations and prior sentencing of defendant." (O.R.1142). Although the survey respondents were asked what they believed was the appropriate punishment for Appellant's offense, they were not provided with any of the evidence either in aggravation of punishment or in mitigation of punishment. (O.R.1150). As best illustrated by the parties' debate within the briefs as to what the poll actually showed, the poll numbers were far from conclusive. Therefore, this poll held limited value in determining the actual receptiveness of the jury pool to a sentence less than death.

¶ 24 Nonetheless, the fact that defense counsel had this information at the time that they advised Appellant regarding the bench trial strategy evinces the thoroughness of defense counsels' investigation. As counsel had the benefit of the poll, we refuse to second guess counsels' strategic decision. *Dawkins*, 2011 OK CR 1, ¶ 20, 252 P.3d at 220. Further, we refuse to find that defense counsel must conform their advice to the statistical analysis set forth in opinion polls

---

6. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, ... or take an appeal.").

7. In his brief, Appellant solely describes the purpose of waiving jury trial as a means to avoid a jury tainted by the information published in the newspaper. However, defense counsel neither provided this as the reason for the jury waiver strategy nor any other explicit reason. (10/08/2010, Tr. 2–30).

to meet the prevailing professional norm. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 25 Appellant alleges that there was "tremendous political pressure" to obtain a death sentence in this case and argues that it was unreasonable to put the sentencing decision into the hands of a single decision-maker facing such public pressure. A review of the record in the present case reveals no evidence that the trial court was subjected to political pressure or even any appearance thereof. To the contrary, the record reveals that the trial judge was impartial. There is no tenable claim in the present case that Appellant's trial was unfairly conducted. *Brumfield v. State,* 2007 OK CR 10, ¶ 30, 155 P.3d 826, 838. As we do not find the existence of any political pressure or impartiality, we find that Appellant has failed to show that counsels' representation was unreasonable under prevailing professional norms. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 26 Appellant further contends that it was unreasonable to proceed with the bench trial strategy because of the trial judge's previous exposure to the victim impact evidence in the first sentencing trial that this Court found inadmissible on direct appeal. *See Malone,* 2007 OK CR 34, ¶¶ 56–62, 168 P.3d at 209–11. We find that defense counsel reasonably concluded that the trial court's previous exposure to the State's evidence was not a detriment to Appellant's case. This Court has long recognized that the trial court acting as trier of fact is capable of hearing inadmissible evidence but only considering competent and admissible evidence in reaching its decision. *See Long v. State,* 2003 OK CR 14, ¶ 4, 74 P.3d 105, 107 ("We presume, when a trial court operates as the trier of fact, that only competent and admissible evidence is considered in reaching a decision."); *Borden v. State,* 1985 OK CR 151, ¶ 9, 710 P.2d 116, 118; *Fox v. State,* 1976 OK CR 307, ¶ 12, 556 P.2d 1281, 1283–84. Since the trial judge had previously seen the State's evidence at the original trial, defense counsel could have reasonably concluded this fact would allow the trial court to better focus on the mitigating circumstances, much of which had not been presented at the first trial. *See Richter,* 131 S.Ct. at 790 ("Although courts may

not indulge *post hoc* rationalization for counsel's decision making that contradicts the available evidence of counsel's actions ... neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.") (quotations and citation omitted). We note that defense counsel specifically informed the trial court in opening statement "we intend to show the Court the other side of Rick Malone ... that is a big part of why we're here again today, is because we didn't hear about those things...." (Tr. 5A, 29). Therefore, we find that Appellant has failed to overcome the presumption that counsels' strategic decision to waive jury resentencing fell within the wide range of reasonable professional assistance and show it could not be considered sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 27 Second, Appellant challenges numerous aspects of defense counsel's closing argument and suggests various ways it could have been better. We review Appellant's claim under the familiar two-part *Strickland* test. *Hancock v. State,* 2007 OK CR 9, ¶¶ 106, 110, 155 P.3d 796, 821–22. We note that the legal argument to be made is a matter of trial strategy. *Short v. State,* 1999 OK CR 15, ¶ 87, 980 P.2d 1081, 1107.

¶ 28 Appellant contends that counsel rendered ineffective assistance by failing to argue that the mitigating evidence outweighed the aggravating evidence or otherwise compelled a sentence less than death. A review of the record in the present case reveals that instead of arguing that the mitigating evidence outweighed the aggravating evidence, defense counsel attempted to provide the trial court with a reason to spare Appellant's life. That was counsel's opening argument. (Tr. 5A, 35). In closing argument, counsel connected with this theme by focusing on "what went wrong?" (Tr. 10, 22). He recited that Appellant had: (1) grown up on the other side of the tracks amidst violence, abuse, mental illness and addiction; (2) become a productive citizen dedicating his life to saving lives as a paramedic, (3) spiraled out of control after mental illness, childhood issues, and the pain of loss led to drug addiction. Counsel argued that Appellant had been returned to the man of compassion,

care, and concern from before the mental illness and drugs. Coupled with this argument, counsel recounted that Appellant's life held value to his family members and argued that the individuals that Appellant had saved and their families would also value his life. Defense counsel read-off seventeen separate mitigating circumstances that he believed "mitigate[d] the issue of punishment." (Tr. 10, 25–27). He argued that the evidence clearly showed that there was no reason to completely remove Appellant from society. Counsel concluded his closing argument by imploring the court to sentence Appellant to imprisonment for life without the possibility of parole.

¶ 29 We refuse to second-guess counsel's decision to argue that there was reason to spare Appellant's life as opposed to arguing that the mitigating evidence outweighed the aggravating circumstances. Defense counsel's argument reflects a fully informed strategic decision between potential arguable defenses. *Hancock*, 2007 OK CR 9, ¶ 110, 155 P.3d at 822 (holding that the often difficult decision of which defense to stress during closing argument is necessarily committed to the strategic judgment of defense counsel); *Sanchez v. State*, 2009 OK CR 31, ¶ 99, 223 P.3d 980, 1012 (finding defense counsel's tactical decision in closing argument objectively reasonable based on informed judgment).

 ¶ 30 Appellant challenges defense counsel's failure to point to the evidence that supported the seventeen mitigating circumstances. We note that counsel's act of reading the seventeen mitigating circumstances effectively summarized the defense's evidence. Nonetheless, the record reveals that counsel did not go through every piece of evidence that supported each mitigating circumstance. Counsel stated; "I'm not going to go through ... every piece of evidence that supports each of those mitigating circumstances ... You've heard it, you know it, you've got it." (Tr. 10, 27). We find that counsel's decision to rely upon the trial judge's recollection of the mitigating evidence to be sound trial strategy. *Long v. State*, 2003 OK CR 14, ¶ 19, 74 P.3d 105, 109 (finding failure to give closing argument at bench trial was sound trial strategy). We

refuse to second guess counsel's strategic decision in this regard. *Hancock*, 2007 OK CR 9, ¶ 110, 155 P.3d at 822.

 ¶ 31 Appellant contends that defense counsel all but conceded that the evidence in aggravation of punishment outweighed the proffered mitigating circumstances. However, it is clear from the record that defense counsel was not conceding that the evidence in aggravation outweighed the mitigating evidence. Instead, defense counsel's argument was that even if the trial judge found the existence of one or more aggravators, this only authorized the court to consider a death sentence. This Court has previously determined that this argument is not a concession of guilt or the imposition of a death sentence. *Turrentine v. State*, 1998 OK CR 33, ¶¶ 89–90, 965 P.2d 955, 979–80. Further, such argument is considered sound trial strategy and does not amount to ineffective assistance. *Id.*; *Williams v. State*, 2008 OK CR 19, ¶ 136, 188 P.3d 208, 231–32; *Patton v. State*, 1998 OK CR 66, ¶ 135, 973 P.2d 270, 304.

 ¶ 32 Finally, Appellant claims that defense counsel encouraged the trial court to sentence Appellant to death by presenting a multitude of evidence suggesting that Appellant deserved mercy and then arguing that a death sentence was the merciful decision.

¶ 33 In *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, this Court found that defense counsel's attempt to convince the jury that "Life Without Parole" was the most extreme punishment because the appellant would have the rest of his life to think about what he had done did not constitute ineffective assistance of counsel. *Id.*, 2001 OK CR 13, ¶¶ 86–88, 28 P.3d at 599 (*overruled on other grounds by Jones v. State*, 2006 OK CR 17, ¶ 12 n. 14, 134 P.3d 150, 155 n. 14). Instead, the Court found that counsel's attempt to entice the jury into sparing the appellant's life was a reasonable trial strategy. *Id.*

¶ 34 Turning to the present case, defense counsel attempted to save Appellant's life by arguing for a sentence of life without the possibility of parole. Counsel argued that life without the possibility of parole carried greater weight than a death sentence because Appellant would have to live each and

every day knowing what he did to Green's family and his own family. Counsel argued that life without the possibility of parole constituted justice because it was the "just and adequate punishment for this crime." (Tr. 10, 28). He further argued that a death sentence was inappropriate because Appellant was not a continuing threat to society, it would end Appellant's punishment, it would harm more people, and it would not bring Trooper Green back or help his family.

 ¶ 35 Although this strategy was ultimately unsuccessful, that does not make it unsound or unreasonable. *Id.* We find that defense counsel's argument that a sentence of life without the possibility of parole carries greater punishment than a death sentence to be sound trial strategy.

¶ 36 Appellant cites to *Collis v. State*, 1984 OK CR 80, 685 P.2d 975, and argues that it is objectively unreasonable for defense counsel to argue that the defendant deserves the maximum punishment. In *Collis*, defense counsel argued that " 'Don Collis, or whoever committed this crime . . . should be punished to the full extent of the law' " but counsel did not argue that his client was innocent. *Id.*, 1984 OK CR 80, ¶¶ 5, 11, 685 P.2d at 976–77. This Court found that taken in context of complete closing argument, counsel's argument was objectively unreasonable because it conceded Appellant's guilt of the offense. *Id.*

¶ 37 This Court's opinion in *Collis* is both legally and factually distinguishable from the present case. *Collis* is distinguishable because it was a non-capital case. *Abshier*, 2001 OK CR 13, ¶ 57, 28 P.3d at 593. Taking defense counsel's entire closing argument in context in the present case, we do not find that counsel conceded Appellant's guilt to imposition of a death sentence. At all times during the case, defense counsel asserted that there was reason to spare Appellant's life. Counsel argued that a death sentence was inappropriate and implored the trial court to sentence Appellant to life without the possibility of parole.

¶ 38 As such, we find that Appellant has failed to overcome the presumption that counsel's closing argument fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct.

at 2065. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

¶ 39 In his third proposition of error, Appellant contends that prosecutorial misconduct deprived him of a fair and reliable sentencing hearing. He asserts that the prosecutor improperly impeached his mitigation witnesses.

¶ 40 Appellant failed to raise a timely objection to all but one of the instances he now challenges as improper. Thus, he has waived appellate review of the challenges for all but plain error. *Romano v. State*, 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115.

 ¶ 41 This Court reviews claims of prosecutorial misconduct for plain error under the standard set forth in *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, *Grissom v. State*, 2011 OK CR 3, ¶ 68, 253 P.3d 969, 992; *Sanchez v. State*, 2009 OK CR 31, ¶ 72, 223 P.3d 980, 1004; *Andrew v. State*, 2007 OK CR 23, ¶ 128, 164 P.3d 176, 202; *Glossip v. State*, 2007 OK CR 12, ¶ 81, 157 P.3d 143, 157; *Myers v. State*, 2006 OK CR 12, ¶¶ 54–55, 133 P.3d 312, 329; *McElmurry v. State*, 2002 OK CR 40, ¶ 130, 60 P.3d 4, 30–31; *Anderson v. State*, 1999 OK CR 44, ¶ 28, 992 P.2d 409, 419. In *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, we detailed the three part test for plain error.

> To be entitled to relief under the plain error doctrine, [an appellant] must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *See Simpson v. State*, 1994 OK CR 40, ¶¶ 3, 11, 23, 876 P.2d 690, 694, 695, 698; 20 O.S.2001, § 3001.1. If these elements are met, this Court will correct plain error only if the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings" or otherwise represents a "miscarriage of justice." *Simpson*, 1994 OK CR 40, ¶ 30, 876 P.2d at 701 (*citing United States v. Olano*,

507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993)); 20 O.S.2001, § 3001.1.

*Id.,* 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

¶ 42 Therefore, the first step of plain error review of a claim of prosecutorial misconduct is to determine whether the prosecutor's comments constitute an actual error. *See Sanchez,* 2009 OK CR 31, ¶ 72, 223 P.3d at 1004; *Myers,* 2006 OK CR 12, ¶¶ 54–55, 133 P.3d at 329. The second step is to determine whether the error is plain on the record. *Glossip,* 2007 OK CR 12, ¶ 81, 157 P.3d at 157. Only if the appellant has shown the existence of an actual error plain on the record do we turn to the third step of the analysis. *See Hogan,* 2006 OK CR 19, ¶ 44, 139 P.3d at 925 (determining that instructions were sufficient thus plain error did not occur); *Martinez v. State,* 1999 OK CR 33, ¶ 40, 984 P.2d 813, 825 (holding that plain error did not occur where there was no error in prosecutor's comments).

¶ 43 The third step is to determine whether the appellant has shown that the prosecutor's misconduct affected his substantial rights. *Glossip,* 2007 OK CR 12, ¶ 81, 157 P.3d at 157; *Hancock,* 2007 OK CR 9, ¶ 101, 155 P.3d at 820. This Court reviews the entire record to determine whether the cumulative effect of improper comments by the prosecutor prejudiced the appellant. *Romano,* 1995 OK CR 74, ¶ 54, 909 P.2d at 115. We determine whether the prosecutorial misconduct so infected the defendant's trial that it was rendered fundamentally unfair. *Hogan,* 2006 OK CR 19, ¶ 87, 139 P.3d at 935.

¶ 44 Turning to Appellant's claims of prosecutorial misconduct in the present case, we first determine whether Appellant has shown the existence of an actual error. Appellant alleges that the prosecutor impermissibly questioned three of his character witnesses regarding events that occurred well after the time period in which the witnesses knew Appellant. He cites to *Dodd v. State,* 2004 OK CR 31, 100 P.3d 1017, and argues that because the witnesses were not testifying to Appellant's "current character" but his "prior honorable character," the prosecutor was prohibited from questioning them concerning events that occurred after they knew Appellant.

¶ 45 The State is permitted to cross-examine the defendant's witnesses at trial.

As a general rule, any matter is a proper subject of cross examination which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness.

*Lott v. State,* 2004 OK CR 27, ¶ 127, 98 P.3d 318, 350. In *Dodd,* we stated:

When the defendant calls witnesses to give opinions about his good character, the State may, in cross-examination, explore the basis for those opinions by inquiring into specific instances of the defendant's bad character, whether the character witness is aware of them, and if not, whether the witness's opinion is altered by the revelation.

*Dodd,* 2004 OK CR 31, ¶ 88, 100 P.3d at 1043. Thus, *Dodd* permits the State to question defense character witnesses concerning specific instances of the defendant's bad character regardless of the character witness' knowledge of the specific instance.

¶ 46 Appellant presented the testimony of Johnny Owens. Owens and Appellant were fellow firefighters. Owens testified that Appellant was very professional, a hard worker, a good firefighter and a good paramedic. Owens did not believe that the individual that he worked with was capable of murder. When defense counsel asked if Owens was aware of Appellant's drug problem, Owens indicated that he did not learn of it until after Appellant had been relieved of duty. Thereafter the prosecutor inquired if Owens was aware that in 2001, Appellant had hit a handicapped man in the head with a beer bottle and been arrested for the Marijuana and Lortab found in his pockets. He also asked Owens if he was aware that in April of 2000, Appellant started smoking methamphetamine and became so addicted that he was making it out in the country on

county roads.[8] Owens indicated that he was unaware of these circumstances. The prosecutor followed up by asking questions aimed to determine whether Owens' opinion was altered by the revelations. Owens indicated that he would not have wanted to go on an emergency run with Appellant if he had known he was abusing steroids, Lortab, and methamphetamine.

¶ 47 The prosecutor's questions to Owens were the proper subject of cross-examination. Owens' testimony as to Appellant's professionalism and general good character entitled the prosecutor to question him whether that opinion was formed with knowledge of specific instances evincing Appellant's character for unprofessionalism and violence. *Dodd,* 2004 OK CR 31, ¶ 90, 100 P.3d at 1043.

¶ 48 The prosecutor's questions to Owens were not misleading. The facts and circumstances of Appellant's drug abuse and attack on the handicapped individual had previously been introduced into evidence in the State's case-in-chief. Owens worked the same shift as Appellant at the fire department for eighteen months. They were partners for six months. The record reveals that Appellant was using illegal steroids and began to abuse prescription medication during this time period. Owens was assigned to a different shift beginning in 2000. Although Owens was not as familiar with the circumstances of Appellant's life after this time, they remained co-workers. Owens related that the firefighters in the department were like brothers. Owens, was aware that Appellant had abused drugs while employed at the fire department ultimately leading to his termination. The specific instances that the prosecutor asked Owens about occurred during the time period in which Owens and Appellant were co-workers. As such, Appellant has not shown the existence of an actual error in the prosecutor's questioning of Owens.

¶ 49 Appellant presented the testimony of Jared Cheek that Appellant was a hard worker, a good paramedic, passionate about helping people and devoted to his fami-

ly. Cheek did not initially believe that Appellant was capable of this type of crime. On cross-examination, the prosecutor questioned Cheek if it was appropriate for emergency responders to abuse steroids, prescription drugs, marijuana or alcohol. When Cheek responded that it was not appropriate, the prosecutor followed-up by asking Cheek if he was aware that Appellant had been fired from the fire department for bringing methamphetamine to the fire station. Cheek was unaware of this circumstance. The prosecutor asked if Cheek was aware that Appellant was using methamphetamine while working as a firefighter and a paramedic and, again, Cheek was unaware of this circumstance.

¶ 50 The prosecutor's questions to Cheek were the proper subject of cross-examination. Cheek's testimony as to Appellant's professionalism and general good character entitled the prosecutor to question him whether that opinion was formed with knowledge of specific instances evincing Appellant's character for unprofessionalism and inappropriate behavior as a first responder. *Id.,* 2004 OK CR 31, ¶ 90, 100 P.3d at 1043. As such, the prosecutor properly sought to determine whether Cheek was aware of Appellant's drug use while acting as a first responder.

¶ 51 The prosecutor's questions to Cheek were not misleading. The facts and circumstances of Appellant's drug abuse had been introduced into evidence before Cheek testified. Although Appellant did not begin to use methamphetamine until after Cheek lost contact with him at the end of 1999, Appellant used illegal steroids and began to abuse prescription medication during the time period that he worked with Cheek. Appellant continued abusing drugs and working as a first responder until he was terminated from the ambulance service on October 26, 2003. As Cheek did not find this type of behavior to be appropriate, this line of inquiry tended to contradict or rebut Appellant's alleged good character at the time. Appellant has not shown the existence of an actual error in the prosecutor's questioning of Cheek.

8. There was conflicting testimony at trial as to when Appellant began using methamphetamine. Initially, the testimony reflected that he started in April of 2000. This date was later revised to April of 2002.

¶ 52 Appellant presented the testimony of Dayna Chaffin that Appellant was very good with patients, very professional and very caring. She never thought he was capable of murder. On cross-examination, the prosecutor questioned Chaffin regarding her knowledge of Appellant. Chaffin's knowledge was limited. She worked at the hospital and only saw Appellant when he brought in a patient. She described him as a fellow healthcare worker. The prosecutor asked Chaffin if she had ever used illegal steroids, abused prescription drugs, smoked marijuana, abused alcohol or used methamphetamine while on the job and she responded in the negative. On re-direct, defense counsel asked Chaffin if the drug use listed by the prosecutor changed her testimony that Appellant was a good paramedic that cared about his patients. Chaffin indicated that it did not. On re-cross, the prosecutor asked Chaffin whether Appellant deceived her by concealing the drug use from her. Chaffin indicated that she may have been misled.

¶ 53 The prosecutor's questions to Chaffin were the proper subject of cross-examination. Chaffin's testimony as to Appellant's professionalism and general good character entitled the prosecutor to question her whether that opinion was formed with knowledge of specific instances evincing Appellant's character for unprofessionalism and inappropriate behavior while working as a healthcare worker. *Id.*, 2004 OK CR 31 ¶ 90, 100 P.3d at 1043.

¶ 54 The prosecutor's questions did not mislead Chaffin. The facts and circumstances of Appellant's drug abuse had been introduced into evidence before Chaffin testified. Although Chaffin testified that she did not see Appellant for several years, it is apparent that Appellant's drug abuse occurred during the time period that she remained familiar with him. Chaffin recounted her familiarity with Appellant through his remarriage in 2001. Appellant has not shown the existence of an actual error in the prosecutor's questioning of Chaffin.

¶ 55 Appellant also challenges the prosecutor's questioning of nine of the defense character witnesses concerning Appellant's "arrest for domestic abuse in 1998." We review Appellant's claim under the three part test set forth in *Hogan*. *Id.*, 2006 OK CR 19, ¶ 38, 139 P.3d at 923. We first determine whether Appellant has shown the existence of an actual error.

¶ 56 Appellant asserts, without citation to authority, that it is improper to cross-examine character witnesses concerning an arrest that has not resulted in a conviction. Inquiry of a character witness into specific instances of conduct, not resulting in conviction, is permissible as long as the conduct precipitating the arrest impeaches the character trait offered. *See Douglas v. State*, 1997 OK CR 79, ¶¶ 32–33, 951 P.2d 651, 664–65; *State v. Gaytan*, 1998 OK CR 71, ¶¶ 2–12, 972 P.2d 356, 357–59. It is the underlying bad conduct itself that serves to test the witness' opinion as to Appellant's character. *Dodd*, 2004 OK CR 31, ¶ 89, 100 P.3d at 1043; *Douglas*, 1997 OK CR 79, ¶ 33, 951 P.2d at 665.

¶ 57 Reviewing the record in the present case, we find that the prosecutor's inquiry of the witnesses as to Appellant's arrest for domestic abuse was permissible because the conduct precipitating the arrest impeached the character trait the witnesses offered. Each of the nine witnesses testified as to Appellant's general good character. This entitled the prosecutor to question each of them as to whether that opinion was formed with knowledge of a specific instance evincing Appellant's character for violence. *Dodd*, 2004 OK CR 31, ¶ 90, 100 P.3d at 1043.

¶ 58 Appellant further asserts that the prosecutor's questions concerning his arrest for domestic abuse were misleading, prejudicial and in bad faith because the clear weight of the evidence at trial proved that he committed no such crime. We find that Appellant's contention is not supported by the record. The testimony at trial established that Appellant committed domestic abuse, i.e., an assault and battery against his spouse. 21 O.S.2011, § 644(C). The State first introduced testimony concerning the domestic abuse incident in its case in support of the continuing threat to society aggravating circumstance. Appellant's wife at the time of

the incident, Mary Beth Malone, testified that Appellant grabbed her arm and would not let go. The incident began when Appellant confronted Mary Beth Malone with evidence of her affair while the two were at a friend's home. Mary Beth Malone walked home and met her sister-in-law inside. Appellant arrived home soon thereafter and the confrontation began. Appellant forced his way into the home and punched a wall. Mary Beth Malone attempted to exit the front door. Appellant grabbed Mary Beth Malone's arm and refused to let her leave. Mary Beth Malone called 911 because she could not get away from Appellant. The officers that responded to the call testified at Appellant's sentencing trial. When the officers arrived they found the back door to the home busted open. They observed several people in the entry way of the home struggling. Mary Beth Malone was on the phone with the 911 dispatcher. Appellant had a hold of her wrist. She was trying to get away from Appellant but he would not let go of her. Appellant's sister was pulling on Appellant's arm directing him to let go of Mary Beth Malone. The officers commanded Appellant to release Mary Beth Malone but Appellant refused to let go. It took two police officers and Appellant's sister to forcibly remove Appellant's grasp of Mary Beth Malone. Appellant continued to resist the officers until they placed him in handcuffs. Afterwards, Mary Beth Malone's wrist was red. Appellant was not charged with the offense but was required to complete an anger management program. As such, we find that Appellant has not shown the existence of an actual error within his challenge to the prosecutor's inquiry into Appellant's arrest for domestic abuse.

¶ 59 Appellant contends that the prosecutor was "bickering" with Mary Sturdevant by stating that: "I understand, and I hope this doesn't get ugly." (App.Brf., 70). We note that the prosecutor's statement was directed to Sturdevant's unresponsive comment personally challenging the prosecutor. (Tr. 7, 50). Appellant has not provided any argument or authority to support this claim. Thus, we find that Appellant has waived appellate review of this claim pursuant to Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2012). *Harmon v. State,* 2011 OK CR 6, ¶ 90, 248 P.3d 918, 946.

¶ 60 Having determined that Appellant has not met the first step of plain error review in any of his challenges, we need not discuss the second and third steps. *See Hogan,* 2006 OK CR 19, ¶ 44, 139 P.3d at 925. Even if we were to erroneously ignore this precedent and find that the prosecutor's questions were an actual error plain on the record, Appellant cannot demonstrate any prejudice. Because the trial court did not find Appellant to be a "continuing threat to society", and the evidence in question was not germane to any other aggravator, Appellant cannot demonstrate any prejudice. *Dodd,* 2004 OK CR 31, ¶ 90, 100 P.3d at 1043. We find that plain error did not occur.

¶ 61 We turn to the sole instance in which Appellant raised a timely objection at trial thus preserving appellate review of the challenge. Appellant contends that the prosecutor improperly impeached defense witness, Jared Cheek, with the fact that Appellant was deceptive and good at concealing things from people. He contends that the question to Cheek was misleading because Appellant did not begin to use methamphetamine until after Cheek lost contact with Appellant. "Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such [as] to deprive the defendant of a fair trial." *Warner v. State,* 2006 OK CR 40, ¶ 197, 144 P.3d 838, 891 (quotations and citations omitted).

¶ 62 Cheek testified that Appellant was a good paramedic. On cross-examination, Cheek testified that it was inappropriate for emergency responders to abuse steroids, prescription drugs, marijuana or alcohol. He also testified that he was unaware that Appellant had used methamphetamine while working as an emergency responder and was fired from the fire department for bringing methamphetamine to the fire station. On redirect, Appellant asked Cheek whether this litany of things that he had not known changed his opinion that Appellant was good at what he did when Cheek knew him and

Cheek responded negatively. On re-cross, the prosecutor asked Cheek if he believed that Appellant had misled or deceived him in light of the fact that Appellant was abusing prescription drugs. Cheek responded: "It raises some questions." (Tr. 7, 22). The prosecutor then asked Cheek whether Appellant was pretty good at concealing those things from his co-workers. The trial court denied Appellant's objection and Cheek responded: "That's true." (Tr. 7, 23).

¶ 63 We find that the prosecutor's question to Cheek was not improper. The matter was the proper subject of cross-examination as it tended to modify, explain, contradict or rebut Cheek's opinion that Appellant was a good paramedic. *Dodd*, 2004 OK CR 31, ¶ 88, 100 P.3d at 1043; *Lott*, 2004 OK CR 27, ¶ 127, 98 P.3d at 350. Appellant was not denied a fair sentencing trial. This assignment of error is denied.

■ ¶ 64 In his fourth proposition of error, Appellant contends that the aggravating circumstances of murder of a peace officer in the performance of official duty and murder committed for the purpose of avoiding arrest or prosecution are unconstitutionally duplicative. He acknowledges that he raised this very claim in his direct appeal and this Court rejected it. In Appellant's original direct appeal, we found that these two aggravating circumstances will often be supported by the same or overlapping evidence but are not unconstitutionally duplicative because they are focused on different aspects of a defendant's crime. *Malone*, 2007 OK CR 34, ¶¶ 76–77, 168 P.3d at 215–16 (*citing Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir.1998)). Therefore, *res judicata* applies and relitigation of the issue is barred. *Mitchell v. State*,

2010 OK CR 14, ¶ 46, 235 P.3d 640, 652. This assignment of error is denied.

■ ¶ 65 In his fifth proposition of error, Appellant contends that his death sentence violates the ban on cruel and unusual punishment found in the Eighth Amendment to the United States Constitution. He does not claim that he is mentally retarded, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that he is insane, *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), or that he was under the age of 18 at the time of his offense, *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).[9] Instead, Appellant argues for the extension of *Atkins* to those individuals that were severely mentally ill at the time of the offense.

¶ 66 This Court has repeatedly rejected this Claim. *Underwood v. State*, 2011 OK CR 12, ¶ 69, 252 P.3d 221, 248; *Grant v. State*, 2009 OK CR 11, ¶¶ 59–61, 205 P.3d 1, 23–24; *Lockett v. State*, 2002 OK CR 30, ¶ 42, 53 P.3d 418, 431. The United States Supreme Court explicitly limited its holding in *Atkins* to the mentally retarded. *Atkins*, 536 U.S. at 320, 122 S.Ct. at 2251. Individuals who are not mentally retarded "are unprotected by the exemption and will continue to face the threat of execution." *Id.*

¶ 67 Appellant cites no cases from any American jurisdiction that hold that the *Atkins* rule or rationale applies to the mentally ill.[10] He has not demonstrated that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders. *See Atkins*, 536 U.S. at 312, 122 S.Ct. at 2247.[11] We expressly reject that the *Atkins* rule or rationale applies to the mentally ill.

---

9. Appellant is not mentally retarded. The record reflects that Appellant is, in fact, very intelligent with an intelligence quotient above 120.

10. In fact, numerous courts have expressly declined to extend the ruling in *Atkins* to the mentally ill. *See In re Neville*, 440 F.3d 220, 221 (5th Cir.2006); *Baird v. Davis*, 388 F.3d 1110, 1114–15 (7th Cir.2004); *State v. Irick*, 320 S.W.3d 284, 298 (Tenn.2010); *Mays v. State*, 318 S.W.3d 368, 379–80 (Tex.Crim.App.2010); *Johnston v. State*, 27 So.3d 11, 26–27 (Fla.2010); *Hall v. Brannan*, 284 Ga. 716, 670 S.E.2d 87, 96–97 (2008); *State v. Ketterer*, 111 Ohio St.3d 70, 95 at ¶ 176, 855

N.E.2d 48, 77 (2006); *State v. Johnson*, 207 S.W.3d 24, 50–51, (Mo.2006); *Matheney v. State*, 833 N.E.2d 454, 458 (Ind.2005).

11. I continue to maintain that it is not proper to adjudicate and interpret the Constitution, or statutes based upon a quasi-popularity "consensus." *See Mitchell v. State*, 2010 OK CR 14, ¶ 79 n. 17, 235 P.3d 640, 658 n. 17; *Murphy v. State*, 2002 OK CR 32, ¶ 29 n. 16, 54 P.3d 556, 567 n. 16. However, I accede to the fact that the United States Supreme Court has followed this progression of thought and thus we must apply it here.

¶ 68 Even if we were to entertain Appellant's policy arguments, Appellant has not demonstrated that his mental illness was such that it could be found to have diminished his culpability. *Lockett*, 2002 OK CR 30, ¶ 42, 53 P.3d at 431. Although there is evidence in the record which would support Appellant's contention that he suffered from some form of mental illness at the time of the offense, he has not shown that his condition was so severe that he is necessarily and categorically less morally culpable than the average murderer or that his punishment will not serve as a deterrent. *Atkins*, 536 U.S. at 318–19, 122 S.Ct. at 2251.

¶ 69 Appellant presented the testimony of Dr. Jonathan Lipman, M.D., and Dr. Antoinette McGarrahan, Ph.D. Both opined that Appellant had been mentally ill for a long time. This illness onset during Appellant's adult years as the mood disorder of depression. Appellant self-medicated with hydrocodone and methamphetamine. The hydrocodone likely dulled the pain associated with Appellant's depression and the methamphetamine likely had a mood elevating effect. However, Appellant's drug and alcohol use caused his condition to worsen. He became severely mentally ill and in need of treatment.

¶ 70 The record reveals that Appellant's mental health worsened during his incarceration. Appellant was incarcerated at Oklahoma State Penitentiary. He was treated for depression and mood swings. The officers that worked with Appellant during his incarceration at the State penitentiary did not note that he had any mental illness issues. His interactions with the staff and other inmates were appropriate. In June of 2008, Dr. McGarrahan evaluated Appellant for competency. Following this evaluation, Appellant was treated at the Oklahoma Forensic Center on two separate occasions. On both occasions, Appellant reported being paranoid of the staff and other inmates and expressed a fear that someone was going to poison his food. Appellant reported hearing a voice but did not exhibit any outward manifestation of auditory hallucinations. Appellant's very high IQ and his medical training caused problems in his assessment. One of the professionals that examined Appellant reported that Appellant conveyed his symptoms in such a fashion as to give the impression that he was listing the criteria from the diagnostic manual, however, he was unable to determine whether Appellant was mentally ill or faking mental illness. A second professional concluded that Appellant was malingering. Nonetheless, Appellant was diagnosed as "Psychotic, not otherwise specified." He benefited from the therapeutic environment at the Forensic Center and was returned to competency. Lipman and McGarrahan found that Appellant suffered from both a psychotic disorder and a mood disorder. Dr. McGarrahan evaluated Appellant during the week of the resentencing trial and determined that Appellant was doing well.

¶ 71 We note that the jury in Appellant's original jury trial rejected Appellant's insanity defense. *Malone*, 2007 OK CR 34, ¶¶ 91–92 n. 172–73, 168 P.3d at 220 n. 172–73. In reviewing the evidence, this Court likewise found that:

> While Malone may well have experienced "methamphetamine psychosis" at some point ... no reasonable juror could have concluded, based upon the entire record in this case, that he was in such a state at the time he shot Green or that he did not deliberately intend to kill Green.

*Id.*, 2007 OK CR 34, ¶ 42, 168 P.3d at 203. "The evidence in this case, though not uncontested, was overwhelming and clearly established that Malone knew what he was doing and deliberately chose to shoot and kill Green." *Id.*, 2007 OK CR 34, ¶ 38, 168 P.3d at 201–02.

¶ 72 The evidence at Appellant's resentencing trial, again, reflected that Appellant was conscious of what he was doing during the offense. The individuals that Appellant spoke to both immediately before and after the offense testified as to their observations of Appellant. Appellant's words and actions were logical and goal-oriented and did not suggest that Appellant was experiencing any sort of disconnect from reality. Based upon these individuals' statements Dr. Lipman believed that Appellant was conscious of what he was doing at the time and able to relate what he was doing shortly afterwards. We

also note that the circumstances of the offense were captured on the dashcam video. The video likewise supports the conclusion that Appellant was logical and goal-oriented and was not experiencing any sort of disconnect from reality.

¶ 73 The trial court considered all of Appellant's mitigating circumstances but rejected them as a basis for imposing a sentence less than death. This Court accepts the trial court's conclusion that Appellant harbored a culpability deserving of the death penalty. *Lockett*, 2002 OK CR 30, ¶ 42, 53 P.3d at 431. As such, this assignment of error is denied.

■■■ ¶ 74 In his sixth proposition of error, Appellant contends the combined errors in his trial denied him the right to a constitutionally guaranteed fair sentencing trial. When there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Williams v. State*, 2001 OK CR 9, ¶ 127, 22 P.3d 702, 732; *Bechtel v. State*, 1987 OK CR 126, ¶ 12, 738 P.2d 559, 561. However, a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State*, 1989 OK CR 59, ¶ 31, 780 P.2d 201, 209. We have not identified any error in the present case. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

## MANDATORY SENTENCE REVIEW

¶ 75 In his first proposition of error, Appellant contends that his death sentence violates the state and federal constitutions because the mitigating factors outweighed the aggravating circumstances.

■■■ ¶ 76 We consider this argument in conjunction with our mandatory sentence review. Pursuant to 21 O.S.2011 § 701.13(C).

we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the trial court's finding of the aggravating circumstances as enumerated in 21 O.S.2011 § 701.12. *Eizember v. State*, 2007 OK CR 29, ¶ 145, 164 P.3d 208, 242.

¶ 77 Turning to the second portion of this mandate, the trial court found the existence of two (2) aggravating circumstances: (1) "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (2) "the victim of the murder was a peace officer . . ., and such person was killed while in performance of official duty." 21 O.S.2001 § 701.12(5),(8). Appellant does not challenge the sufficiency of the State's evidence to support either of these aggravating circumstances. We find that the great weight of the evidence established that Appellant murdered Trooper Green for the purpose of avoiding lawful arrest and prosecution for manufacturing methamphetamine and while Green was acting as a peace officer in the performance of his official duty. *See also Malone*, 2007 OK CR 34, ¶ 72, 168 P.3d at 214 (finding that "avoid arrest or prosecution" and "peace officer . . . killed while in performance of official duty" aggravating circumstances clearly established by first stage evidence). As such, the evidence supports the trial court's finding of the aggravating circumstances as enumerated.

■■■ ¶ 78 Appellant urges this Court to "independently reweigh" the evidence supporting the aggravating circumstances as well as the evidence offered in mitigation.[12] The State argues that factual substantiation of the verdict requires nothing more than the determination required by 21 O.S.2011 § 701.13(C).

■■■ ¶ 79 Appellant is correct that 21 O.S. 2011. § 701.13(F) requires this Court to "ren-

---

12. Appellant first sought to have this Court review his sentence under 21 O.S.2011, § 701.13(F) and overrule *Rojem v. State*, 2009 OK CR 15, 207 P.3d 385. and *Coddington v. State*, 2011 OK CR 17, 254 P.3d 684, in his Reply Brief. Propositions of error advanced for the first time in a reply brief are deemed waived and forfeited for consideration. Rule 3.4(F), *Rules of*

*the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2012). As this Court has a duty to conduct a mandatory sentence review whenever the death penalty is imposed, we directed the State to file a supplemental brief. Appellant and appellate counsel are notified that in the future this Court will deem waived all propositions of error advanced for the first time in a reply brief.

der its decision on the legal errors enumerated, the factual substantiation of the verdict, and the validity of the sentence." *See Stouffer v. State*, 1987 OK CR 166, ¶ 10, 742 P.2d 562, 564 (opinion on rehearing). However, this Court does not act as an independent factfinder or substitute our judgment for that of the trier of fact. In *Rojem v. State*, 2009 OK CR 15, 207 P.3d 385, we explained that:

> In Proposition VI Rojem claims that his death sentence violates the state and federal constitutions because mitigating factors outweighed the aggravating circumstances. He asks this Court to independently weigh the evidence for the death penalty and set aside the verdict. This request suggests a misunderstanding of this Court's role. In its mandatory sentence review, this Court considers whether the death penalty was imposed under the influence of passion, prejudice or any other arbitrary factor. We do not substitute our judgment for that of the jury, but review the record taking into account any circumstances which may have improperly affected the jury's verdict....

*Id.*, 2009 OK CR 15, ¶ 22, 207 P.3d at 394–95.

¶ 80 In *Coddington v. State*, 2011 OK CR 17, 254 P.3d 684, we reaffirmed this Court's deferential appellate role:

> In Proposition XVIII, Coddington asks this Court to modify his sentence under its mandatory sentence review authority. This Court is required in every capital case to determine whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the jury's findings of aggravating circumstances. 21 O.S.2001, § 701.13(C). In this proposition, Coddington asks the Court to independently weigh the evidence presented at his resentencing trial, and to conclude that it does not support a sentence of death. This is not the Court's role. In conducting our mandatory sentence review, we analyze the record for any circumstances which may have improperly affected the jury's verdict. *Rojem*, 2009 OK CR 15, ¶ 22, 207 P.3d at 395. The Court is not acting as an independent fact-finder, and we do not substitute our judgment for that of the jury's.

*Id.*, 2011 OK CR 17, ¶ 96, 254 P.3d at 717.

¶ 81 Appellant argues that *Rojem* and *Coddington* should be overruled. Relying, in part, upon Judge Cornish's writing in *Burrows v. State*, 1982 OK CR 6, 640 P.2d 533, he asserts that 21 O.S.2011, § 701.13(F) requires this Court to conduct a *de novo* review of the aggravating circumstances and mitigating circumstances to determine whether the verdict is factually substantiated, *i.e.*, without any deference to the original determiner of sentence. Appellant urges us to do something that the statute does not allow. Section 701.13(F) only authorizes this Court to review the sentence. It does not authorize or direct this Court to act as an independent factfinder or substitute our judgment for that of the trier of fact. *State v. Young*, 1999 OK CR 14, ¶ 27, 989 P.2d 949, 955 (statutes are to be construed according to the plain and ordinary meaning of their language).

¶ 82 This Court has previously determined the nature of review afforded to Appellant's claim. In *Fisher v. State*, 1987 OK CR 85, 736 P.2d 1003, the appellant claimed that his death sentence had to be set aside because the mitigating circumstances outweighed the aggravating circumstances. *Id.*, 1987 OK CR 85, ¶ 21, 736 P.2d at 1010. The State argued for a sufficiency of the evidence standard to be applied. *Id.* The appellant quoted Judge Cornish's separate writing in *Burrows* stating: " 'Merely to find that capital punishment was factually supported or justified by the evidence does not rise to the separate and independent judgment required of the reviewing court in death penalty cases,' " and urged this Court to make a separate and independent judgment that the aggravating circumstances outweighed the mitigating factors. *Id.*, 1987 OK CR 85, ¶¶ 22–23, 736 P.2d at 1010–11, *quoting Burrows*, 1982 OK CR 6, 640 P.2d at 552–53 (Cornish, J., concurring in part and dissenting in part). We distinguished *Burrows* finding that:

> *Burrows*, however, represented a badly divided Court. In *Burrows*, Judge Bussey voted to affirm both the judgment and sentence while Judge Cornish voted to affirm the judgment, but modify the punish-

ment to life imprisonment because he felt the mitigating circumstances outweighed the aggravating circumstances. *Id.* at 552–553. Judge Brett voted to reverse the judgment on the ground of insufficient evidence to show malice aforethought, but agreed to a modification in light of the views held by his colleagues.

*Id.*, 1987 OK CR 85, ¶ 22, 736 P.2d at 1010.[13] Instead of acting as an independent factfinder, we determined that "this Court will review such evidence only to the extent necessary to determine whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence." *Id.*, 1987 OK CR 85, ¶ 25, 736 P.2d at 1011. This standard, which is analogous to *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04, comports with the requirements of due process and adequately ensures that the death penalty is evenly enforced. *Id.*

¶ 83 Our decisions in *Rojem* and *Coddington* are not inconsistent with *Fisher*. *Rojem* and *Coddington* did not extinguish this Court's statutory duty to determine the factual substantiation of the verdict and the validity of the sentence. We note that we determined that the sentence of death was factually substantiated and appropriate in both cases. *Coddington*, 2011 OK CR 17, ¶ 99, 254 P.3d at 718; *Rojem*, 2009 OK CR 15, ¶ 30, 207 P.3d at 397. Instead, both *Rojem* and *Coddington* stand for the same tenet as *Fisher*. This Court does not act as an independent factfinder and we do not substitute our judgment for that of the judge or the jury.

 ¶ 84 The reason for this deferential review is the unique, subjective nature of the trier of fact's judgment about the punishment that a particular person deserves. *See Underwood v. State*, 2011 OK CR 12, ¶ 62 n. 25, 252 P.3d 221, 246 n. 25.

"Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required." *Romano v. State*, 1993 OK CR 8, ¶ 111, 847 P.2d 368, 392, *citing Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The "beyond a reasonable doubt" burden of proof analysis is not strictly applicable to the weighing process of the second stage. *Id.*, 1993 OK CR 8 at ¶ 112, 847 P.2d at 392. "While the State must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a fact which must be proved beyond a reasonable doubt. Instead, it is a balancing process." *Id.*, *citing Johnson v. State*, 1987 OK CR 8, ¶ 44, 731 P.2d 993, 1005.

*Eizember*, 2007 OK CR 29, ¶ 149, 164 P.3d at 243. The trier of fact's "consideration of aggravators *versus* mitigators is a balancing process which is not amenable to the 'beyond a reasonable doubt' standard of proof." *Underwood*, 2011 OK CR 12, ¶ 62, 252 P.3d at 246. "[I]t is a highly subjective and largely moral judgment about the punishment that a particular person deserves." *Id.* (quotations and citations omitted). Therefore we review the evidence under § 701.13(F) only to the extent necessary to determine whether there was sufficient evidence from which a rational trier of fact could find that the balance of aggravating and mitigating circumstances warranted a death sentence.

¶ 85 Appellant acknowledges our use of the *Fisher* deferential review but argues that it is the exception rather than the rule. He contends that in *Ullery v. State*, 1999 OK CR 36, 988 P.2d 332, *Davis v. State*, 2011 OK CR 29, 268 P.3d 86, and in other instances, it did not appear that this Court used the test from *Fisher*. Although we have failed to cite to § 701.13(F) and *Fisher* in many instances, the test set forth in *Fisher* is the standard of review that this Court utilizes to determine the factual substantiation of the verdict and the validity of the sentence. *Jackson v. State*, 2006 OK CR 45, ¶ 58, 146 P.3d 1149,

---

13. We further note that at the time that *Burrows* was decided the statute in effect required this Court to perform a proportionality review of the sentence to that of others found guilty of murder. 21 O.S.1981, § 701.13(C)(3). This provision was repealed by 21 O.S.Supp.1986, § 701.13, and this Court determined that such a review was unnecessary under our sentencing scheme. *Foster v. State*, 1986 OK CR 19, ¶ 40, 714 P.2d 1031, 1041.

1166; *Banks v. State,* 2002 OK CR 9, ¶ 55, 43 P.3d 390, 403; *Young v. State,* 2000 OK CR 17, ¶¶ 79–80, 12 P.3d 20, 42–43; *Bernay v. State,* 1999 OK CR 37, ¶ 67, 989 P.2d 998, 1015; *Patton v. State,* 1998 OK CR 66, ¶ 114, 973 P.2d 270, 300; *Jackson v. State,* 1998 OK CR 39, ¶ 84, 964 P.2d 875, 895; *Turrentine,* 1998 OK CR 33, ¶ 86, 965 P.2d at 979; *Gilbert v. State,* 1997 OK CR 71, ¶ 83, 951 P.2d 98, 119; *Carpenter v. State,* 1996 OK CR 56, ¶¶ 48–52, 929 P.2d 988, 1000–01; *Brecheen v. State,* 1987 OK CR 17, ¶ 54, 732 P.2d 889, 899, *overruled on other grounds by Brown v. State,* 1994 OK CR 12, 871 P.2d 56.

 ¶ 86 This Court's use of the terms "independent review" and "weighing" are consistent with the test set forth in *Fisher.* *See Johnson v. State,* 2012 OK CR 5, ¶ 42, 272 P.3d 720, 733; *Davis,* 2011 OK CR 29, ¶ 233, 268 P.3d at 139; *Ullery,* 1999 OK CR 36, ¶ 46, 988 P.2d at 352–53. Under *Fisher,* we review the evidence only to the extent necessary to determine "whether there was sufficient evidence from which a rational sentencer could find that the *balance* of aggravating and mitigating circumstances warranted a death sentence." *Fisher,* 1987 OK CR 85, ¶ 25, 736 P.2d at 1011 (emphasis added). The review afforded under *Fisher* is, in fact, an independent review conducted by this Court but it impinges on the trier of fact's discretion only to the extent necessary to guarantee the fundamental protection of due process of law. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Fisher,* 1987 OK CR 85, ¶ 25, 736 P.2d at 1011 (finding test analogous to *Jackson v. Virginia* test adopted in *Spuehler*). The *Fisher* inquiry does not require this Court to ask itself whether it believes that the balance of aggravating and mitigating circumstances warranted a death sentence. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2789. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to prosecution, any rational trier of fact could find that the balance of aggravating and mitigating circumstances warranted a death sentence. *Fisher,* 1987 OK CR 85, ¶ 25, 736 P.2d at 1011; *see also Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. The factfinder's role as weigher of the aggravating and mitigating circumstances is pre-

served through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789

 ¶ 87 We explicitly distinguish the deferential review in *Fisher* from the instance where this Court finds an aggravating circumstance invalid and reviews to determine whether the improper aggravator is harmless and the sentence of death still valid. *Myers v. State,* 2006 OK CR 12, ¶¶ 105–06, 133 P.3d 312, 336. When at least one valid aggravating circumstance remains which enables the trier of fact to give aggravating weight to the same facts and circumstances which supported the invalid aggravator, this Court conducts an "independent reweighing" of the aggravating and mitigating evidence. *Id.; Battenfield v. State,* 1998 OK CR 8, ¶ 22, 953 P.2d 1123, 1129, 953 P.2d 1123; *Malone v. State,* 1994 OK CR 43, ¶¶ 40–42, 876 P.2d 707, 718–19; *Robedeaux v. State,* 1993 OK CR 57, ¶ 71, 866 P.2d 417, 433; *Barnett v. State,* 1993 OK CR 26, ¶ 31, 853 P.2d 226, 234; *Castro v. State,* 1987 OK CR 258, ¶ 5, 749 P.2d 1146, 1148 (Opinion on Rehearing); *Stouffer,* 1987 OK CR 166, ¶ 10, 742 P.2d at 564. We have recognized that this Court's authority to independently reweigh the aggravating and mitigating circumstances originates from subsections C and F of § 701.13. *Stouffer,* 1987 OK CR 166, ¶ 10, 742 P.2d at 563. However, we do not utilize the *Fisher* test in such instance for the very reason that one of the aggravating circumstances has been found to be invalid. The *Fisher test* is unworkable in such an instance. For this Court to determine that a death sentence is valid following the invalidation of an aggravating circumstance, we must determine both that the remaining aggravating circumstances outweigh the mitigating circumstances and the weight of the improper aggravator is harmless. *Myers,* 2006 OK CR 12, ¶ 106, 133 P.3d at 337. To find an improper aggravator to be harmless error, the Court must be able to determine from the record that the elimination of the improper aggravator cannot affect the balance beyond a reasonable doubt. *Id.* This review is consistent with the rule announced by the Unit-

ed States Supreme Court in *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). *Id.*, 2006 OK CR 12, ¶¶ 105–06, 133 P.3d at 337. Therefore, we independently reweigh the aggravating and mitigating circumstances only in the instance that we determine that an aggravating circumstance is invalid.

¶ 88 Turning to the record in the present case, we found that both aggravating circumstances found by the trier of fact were valid. As such, we do not independently reweigh the aggravating and mitigating circumstances pursuant to *Myers*. Instead, we review the present case under the test set forth in *Fisher*. Taking the evidence in the present case in the light most favorable to the prosecution, we find that a rational trier of fact could find that the balance of aggravating and mitigating circumstances warranted a death sentence.

¶ 89 At the resentencing trial, the State presented evidence nearly identical to the evidence which it had introduced in the first stage of the trial. The evidence revealed that Appellant fell asleep in the front seat of his sister's car while manufacturing methamphetamine on the side of a rural county road. At the request of the local newspaper delivery person, Trooper Green stopped to see if Appellant needed assistance. Green observed the components of the methamphetamine lab on the ground around the car. He attempted to place Appellant under arrest. Green had one handcuff on Appellant's wrist, when Appellant decided to fight the officer to avoid going back to jail. In the ensuing struggle, Appellant obtained Green's service weapon and held Green at gunpoint.

¶ 90 Due to Appellant's statements and the dashcam video, the circumstances of this offense are far more certain than many offenses. Although little of the offense can be visually discerned from the dashcam video, the auditory portion of the video is illuminating.[14] After Appellant got control of the gun and had Green facedown on the ground, Green told Appellant that he could run and leave him if he wanted. Green explained to Appellant that he had children and pleaded with him "[i]n the name of Jesus Christ." (Tr. 5B, 975). A lengthy dialogue occurred wherein Appellant repeatedly asked Green where the handcuff keys were at and threatened him with death if the keys were not located. Appellant also asked Green where he dropped his gun. Throughout the dialogue, Green continued to plead for Appellant not to harm him as neither man could find the keys. Green finally volunteered that there were more keys in his patrol unit. However, Appellant stated, "I don't need to know." (Tr. 5B, 999). Green recognized Appellant's thought process and began to audibly pray. Green's prayer was interrupted when Appellant shot him in the back of the head. Appellant did not comment or make any sound. Eleven seconds later, Appellant shot Green in the back of the head for a second time. Appellant cleaned up the meth lab, put the components in the car, and drove away. Appellant confessed to his meth-making comrades that he killed Green after the Trooper had caught him making methamphetamine.

¶ 91 The evidence at resentencing further revealed that Appellant did not act on a whim but had thought out his actions prior to shooting Green. Appellant told his meth-making comrades that he would kill police officers to avoid going back to jail. In the weeks preceding Trooper Green's discovery of Appellant's methamphetamine lab, Appellant had twice been arrested and bonded out of jail. Appellant was arrested for possession of methamphetamine on November 10, 2003. He was arrested for conspiracy to manufacture methamphetamine on December 21, 2003. Following these arrests, Appellant told Tyson Anthony that:

> He said he couldn't go back to jail. If he went back to jail he wouldn't get back out

14. Although the trial court did not find the existence of the continuing threat aggravating circumstance, the trier of fact was free to consider the dashcam video in its determination of Appellant's sentence because it represented the circumstances of the offense. It is a settled principle of United States Supreme Court jurisprudence that the sentencer should consider the circumstances of the offense in deciding whether to impose the death penalty. *Tuilaepa v. California*, 512 U.S. 967, 977–78, 114 S.Ct. 2630, 2637–38, 129 L.Ed.2d 750 (1994).

and that he would shoot them before he went back to jail ... He said "kill them." (Tr. 3, 12–13). Appellant made similar statements to Tammy Sturdevant, James Rosser and Jamie Rosser. On the night that Appellant shot Green, Appellant borrowed a pistol from Anthony in case he got pulled over. After the offense, Appellant explained to Tyson Anthony and James Rosser that he shot the Trooper because he did not want to go back to jail.

¶ 92 Appellant presented 49 witnesses in mitigation. Through these witnesses Appellant presented testimony in support of his mitigating circumstances: Appellant was suffering from severe yet treatable mental illness that had been present for a very long time (depression and/or a mood disorder); he was born with both a predisposition towards mental illness and substance abuse; he was both severely mentally ill and under the influence of one or more illegal substances at the time of the crime; he was not being treated for either mental illness or substance abuse at the time of the crime; he is currently being treated for psychosis, not otherwise specified, a mood disorder, and depression; he has posed no threat to anyone in the past several years; he has been a model inmate in the penal setting as well as a model patient in the therapeutic setting; he was born into a troubled household detached from good role models and full of both physical and emotional abuse; he witnessed neglect, alcoholism, illicit drug use, and sexual promiscuity by his parental figures while growing up; he worked hard throughout his life to build a stable home life but failed at each turn because of mental illness, addictions, and/or the infidelity of his marital partner; he adopted and raised three children, one of whom served honorably in the U.S. military; he was an emergency medical technician and paramedic that personally saved many lives; he was an above average paramedic who often performed compassionate acts that were not required of him by his job responsibilities; he tried to protect his sisters from danger or ridicule; he has children who love and care for him very much and who will still gain great meaning from his life; he was and continues to be an excellent father to his children; receipt of a death sentence will devastate the innocent lives of his children and grandchildren; he has other family members who love and care for him and who still gain great meaning and value from his life; and he has consistently expressed remorse for not only killing Trooper Green but also for the great damage that act has done to the Green family, others who loved Trooper Green and his own family. Appellant also presented evidence that he had returned to being the caring, compassionate man that he was before the drug abuse.

¶ 93 Much of Appellant's mitigating evidence was conflicting. The State examined Appellant's witnesses and introduced evidence concerning the numerous positive factors in Appellant's life. Appellant, as a teenager, attended church; he had the benefit of one-on-one guidance concerning life decisions from his youth leader; he excelled in sports and was a State champion in track; he had the benefit of a coach that counseled him about life decisions; he had steady employment and a blossoming career; he had a good relationship with his employer; he graduated high school, attended college and studied criminal justice; he had an above average IQ, received medical training, and became a paramedic; he had the benefit of educators that cared for his well-being; his emergency medicine instructor offered to be his instructor for life; he had a loving mother; he had caring co-workers and friends; he had a friend that grew-up in similar circumstances that was willing to help him succeed; and he had the opportunity to utilize community resources like counseling. The State also presented evidence that Appellant began abusing drugs before the negative events of his adult life had occurred. As such, a rational trier of fact could have reasonably rejected Appellant's predisposition theory and concluded that Appellant's personal choices as an adult led him to kill Trooper Green.

¶ 94 As the mitigating evidence was conflicting and the great weight of the evidence supported the existence of the two aggravating circumstances, we find that there was sufficient evidence from which a rational trier of fact could find that the balance of aggrava-

ting and mitigating circumstances warranted a death sentence. Proposition One is denied.

¶ 95 We find the sentence of death to be factually substantiated and appropriate. 21 O.S.2011, § 701.13(F). Under the record before this Court, we cannot say the trier of fact was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2011 § 701.13(C). in finding that the aggravating circumstances outweighed the mitigating evidence. We affirm the sentence of death. 21 O.S.2011, § 701.13(E). Accordingly, finding no error warranting reversal or modification, this appeal is denied.

## DECISION

¶ 96 The Sentence of death is hereby *AF-FIRMED.* Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2013), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, J., A. JOHNSON, J., and LEWIS, P.J.: concur.

SMITH, V.P.J.: concur in results.