## *Ex parte* PAUL HAYES *et al.*

No. A-1452.   Opinion Filed November 9, 1911.

(118 Pac. 609.)

1. **CONSPIRACY—Criminal Responsibility—Liability for Acts of Co-Conspirators.** Where two or more persons combine together for the purpose of accomplishing some unlawful act, every act or declaration of either of · such persons in pursuance of the common concerted plan and with reference to the common object is, in contemplation of law, the act and declaration of all of them.

2. **SAME.** A conspiracy makes each conspirator liable under the criminal law for the act of each other conspirator done in pursuance of such conspiracy.

3. **SAME—**The least degree of concert of action or collusion makes the act of one conspirator the act of all.

4. **SAME—Evidence—Acts and Declarations of Conspirators.** Slight evidence of collusion is all the law requires to admit the acts and declarations of a conspirator in evidence against his co-conspirator.

5. **SAME.** Written correspondence and entries in books and other documents made by one conspirator, having reference to the common object of the conspiracy, are admissible in evidence against a co-conspirator.

6. **BAIL—Criminal Prosecutions—Weight of Evidence.** For circumstances which require the refusal of bail in a murder case, see statement of case and opinion.

7. **EVIDENCE—Circumstantial Evidence—Sufficiency.** The chain theory with reference to circumstantial evidence repudiated, and the cable theory adopted.

(Syllabus by the Court.)

Application by Paul Hayes and another for writ of *habeas corpus.* Petitioners remanded to custody of sheriff.

The petitioners, Paul Hayes and Edgar Harry White, being in the custody of the sheriff of Pottawatomie county, under and by virtue of a commitment issued out of a justice court of said county, after a preliminary · examination therein, wherein said petitioners were charged with the murder of one Arthur Arnett, and upon which said preliminary examination the petitioners were committed by Hal Johnson, said justice of the peace, to the custody of said sheriff without bail to await trial on said charge,

6 Cr.—11

petitioners have applied for a writ of *habeas corpus,* in which they do not ask to be admitted to bail on said charge, but seek to be dismissed entirely from said custody, upon the ground that there was no evidence introduced or offered which showed or tended to show in any manner that said petitioners were guilty of said charge of murder, or of any other offense against the laws of the state of Oklahoma.

The following is the substance of the testimony introduced upon this hearing:

E. J. Ross testified that he was acquainted with Arthur Arnett, the deceased, and that Arnett lived at McLoud, Pottawatomie county, Okla., and that he was killed about 2 o'clock in the morning, on the 21st day of April of the present year. Witness examined the body of said Arnett after his death; that he found a pistol bullet wound in the left side of the head of the deceased; that he found the body lying near a cellar door back of a store in the town of McLoud; that he found tracks of two men, who had apparently run off from where the deceased was lying; that these tracks first went west, and then a little south, and then went west again; that one of the tracks was a small track, and the other was tolerably large; that the witness did not take the measurements of the tracks, but in his judgment the small track was made by a No. 5 shoe, and the larger track was made by a No. 8 shoe; that they went from where the body of Arnett lay about 20 steps to an alley, and then they went south one-half block, and then west again, then went north one-half block, and then turned west again; that the witness followed these tracks to the edge of town, and they went north of town toward the town of Harrah, which is about five miles distant from there; that the body of the deceased, when found by the witness, was about three or four feet from the cellar door; that the cellar door was in the back and under John Seikel's store; that there was a safe in the office of this store; that from the trap door of the cellar you go down steps, and then come to another door that goes into the cellar; that after entering the cellar door are steps going up into the

store near the office. The witness described minutely the course taken by the persons leaving the body of the deceased, and testified that they passed through a number of alleys. The witness said this was a starlight night, but didn't think the moon was shining, and that the parties who were at the body of the deceased had lanterns and waited until daylight, and that guards were stationed to keep persons away from the tracks. Witness also testified that the tracks leaving the body of the deceased followed the alleys described pretty clearly. Witness also produced and identified the bullet which was cut from the head of the deceased. He testified further that he was not a judge of such matters, and that he could not tell what the caliber of the bullet was.

Jerry Spann testified that he was assistant chief of police of Shawnee, and that he knew the deceased, who was city marshal of McLoud; that he saw him a little while after he was killed; that the deceased was shot through the head, and had one shot across the neck, which was a flesh wound. The witness testified as to the tracks going from the body of the deceased substantially as the preceding witness had testified, except that he followed the tracks to within 1 mile or 1½ miles of Harrah. He also minutely described the measurements taken of both of the tracks. The small track was about a 5 or 5½ shoe. The large track was about an 8 or 8½ shoe. He had seen tracks reputed to be the tracks made by both of the petitioners. The tracks reputed to be tracks made by Edgar Harry White showed exactly the size of shoe of one of the tracks from the body of the deceased at McLoud. The measurements of the tracks which were reputed to be the tracks of Paul Hayes were but a very little longer than the tracks which went from the body of Arnett; that the witness followed the tracks leaving the body of the deceased four or five miles, and upon a careful observation from all appearances they were the same tracks that were reputed to have been made by the petitioners. The tracks leading from the dead body of Arnett appeared to be made by men running for about two miles,

and after that they got close together, as though they had slowed down.

Thomas Hayes testified that he went to the body of the deceased shortly after he was killed; that he found him lying back of John Seikel's store in McLoud; that he found on or near the body deceased's pistol, two or three lead pencils, and his hat. He also testified with reference to the tracks substantially as the other witness had testified, except that he did not measure them; that witness was acquainted with the defendant White, and knew him when he lived in McLoud; that defendant White lived in McLoud several years, but left there several years before the killing.

A. A. Gordon testified that he lived in Oklahoma City, and was a member of the police department; that he was acquainted with both of the petitioners; that he knew the defendant White by the name of Harry White; that he arrested the defendant Hayes at his home in Oklahoma City; that he took several books which he found in the residence of defendant Hayes; that one was a large book, like a ledger, and that there were three or four small daybooks; that the large book contained combinations to different safes—that is, the figures and letters of combinations of safes, by which they could be opened; that in his judgment there were 150 combinations of safes in the book, and possibly more; that he examined one of the little books taken from the home of Hayes, and on page 190 he found the combination to a Mosler safe, with the name of John Seikel, McLoud, Okla; that the books which he got from the house of Hayes were taken from under a sanitary couch or cot; that the defendant Hayes was present at the time, but that witness did not have any conversation with the petitioner; that the petitioner Hayes was lying there on the couch; that witness had several times seen the petitioners together in Oklahoma City around on the streets, but does not remember whether he saw them together on the 21st day of April or not, but remembered seeing them together, both day and night; that the petitioner Paul Hayes worked for the Conger Safe Company.

Joe Palmer testified that he was present when the petitioner Hayes was arrested by policeman Gordon, and that he saw Gordon get one large ledger and a number of small daybooks; that these books were full of combinations for opening safes; that while the witness and Gordon were searching Hayes' house he saw Mrs. Hayes, wife of petitioner Hayes, with her hand upon the end of a shelf; that she took her hand away, and witness went to where she was and picked up a letter, which was crumpled. This letter was then introduced in evidence, and is as follows:

"Oklahoma, Okla. Sept. 10—1911. Dear Harry: Your letter came to hand today and was glad to heard from you. If this safe has a combination to the inside door, it certainly must have a chest on the inside of it yet and if it is made with a chest it would take nearly two days to drill it as it is made of the hardest of the hardest of steel and it is mighty hard to drill. See if there is not some good fireproof safe in a mercantile house or office there that you think will be pretty good or locate two or three and we can do them all in one night if things are as you say, no difference. Also there might be something good in some adjoining town that will be easy to get. Look around good and then write me a letter and tell me the name of the places and it may be that I have the dope on it and will not have to make any noise at all until after we have got the cail. Write me at number 134 West Fifth street, and I will get it without any one else handling it. How big is Wanette and what towns are close around there, also try and give the make of any safe that you think looks good so I will know just what to bring with me. Hoping this reaches you all O. K., I am."

That witness was partially acquainted with the handwriting of petitioner Hayes and recognized it in several books which were taken from his house. The witness had had no conversation with either of the petitioners.

George Bowman testified that he had lived in McLoud for about three or four years. That he was a cab driver. Witness was acquainted with the deceased, Arnett, who lived in the town of McLoud, and was city marshal of said town. That he worked at night. That witness was with deceased about 2 o'clock, when deceased went to the rear of Seikel's store for the purpose of

registering as night watchman. That he then noticed that the door coming out of the basement under the store was about one-half open, and witness asked deceased if it was open that way all night, and deceased answered, "It isn't." At this time the door moved a little, and deceased said: "There is somebody in there; bring a light up." That witness came up with a light. That just at the time two men walked out of the door, and deceased said, "What are you doing in there?" They replied that they were hunting a bed. Deceased said to them, "Come out of there, and go with me." One man came out just ahead of the other and faced northeast; the other came out facing west, and turned around facing east, and began firing. The deceased was standing at the northeast corner of the door. The witness was near enough deceased to touch him with his hand. The night was dark. Witness had a little railroad lantern with him. When the firing began, witness ran. He afterwards went back and found Arnett lying on the ground, dead. His gun was lying by his side. The first man who came out weighed from 125 to 130 pounds. The second man weighed probably 135 or 140 pounds. They both looked to be 25 or 30 years of age. Both were smooth-shaved. The first man who came up straightened himself up well quick. The large man did the shooting. The witness had seen the petitioner Paul Hayes at Tecumseh since his arrest, probably two or three weeks before the trial. He says he cannot recognize petitioner Hayes thoroughly as one of the parties there that night. Witness saw Paul Hayes, in Tecumseh, straighten himself up just as the first man did who came out of the cellar. The petitioner Hayes is about the same height. Witness had never seen another man make movement just like that made by the man who came out of the cellar, and by petitioner Hayes at Tecumseh. Petitioner White is about the same size and height of the second man who came out of the cellar, and the man who did the firing.

Charles W. Friend testified that he saw the two petitioners make the tracks at Tecumseh which were measured by the witness Spann, and pointed them out to said witness Spann. It was stip-

ulated by and between the county attorney and counsel for petitioner White that said witness resides in the town of Wanette, Pottawatomie county, Okla.

John Seikel testified that he resided in McLoud on the 21st day of April of the present year, and that he conducted a general merchandise business there; that Arnett was killed about 20 feet from the rear of his building; that at this time the witness had a Mosler safe in his store, and had had it for about three years; that he bought this safe from the Conger Safe Company of Oklahoma City; that he understood that petitioner Hayes worked for this safe company.

A. J. Herring testified for the petitioner that on the 21st day of April of the present year he was running the Agnes Hotel at Norman, Okla.; that the name P. K. Hayes was registered as a guest of said hotel on the 21st day of April of the present year. He recognized petitioner Hayes as the party who wrote the signature on the hotel register.

*Moman Pruiett, Edward E. Reardon,* and *G. W. Jenkins,* for petitioners.

*Smith C. Matson,* Asst. Atty. Gen., and *C. P. Holt,* County Atty., for the State.

FURMAN, P. J. (after stating the facts as above). Upon the trial of this cause, counsel for the petitioners objected to the introduction of the letter testified to by the witness Palmer as having been found at the house of the petitioner Hayes, upon the ground that it could not in any event be considered as evidence against the petitioner White. It was insisted in argument by the Assistant Attorney General that this letter was competent evidence against both of the petitioners, upon the ground that the evidence in the case established the fact that this crime of murder was not committed alone in a conspiracy to rob the mercantile establishment of Seikel at McLoud, but that the robbing of such establishment was only one act in a general conspiracy to rob similar establishments all over the state of Oklahoma, and

that such general conspiracy, formed prior to the attempted rob-
bing of the McLoud mercantile establishment, did not cease
with the killing of Arnett, but continued in the minds of these
defendants up to the very hour of their arrest, and that this let-
ter was clearly admissible for that reason against both. In other
words, the conspiracy formed between Hayes and White and
those who may have operated with them was general in its na-
ture, extremely comprehensive in its scope, of which general
conspiracy the robbing of the Seikel mercantile establishment at
McLoud was only an incidental part, and that the letter was also
admissible as showing the intimate relationship existing between
petitioners.

We think that the position assumed by the Assistant At-
torney General is sound in law. Where two or more persons
combine together for the purpose of accomplishing some unlawful
act, every act and declaration of each of such persons in pur-
suance of the original concerted plan and with reference to the
common object is, in contemplation of law, the act and declara-
tion of them all, and is therefore original evidence against each
one of them. In other words, every person who enters into a
common purpose or design is in law held to be a party to every
act which may be done by any of the others in furtherance of
such common design. See volume 1, Greenleaf on Evi. (16th
Ed.) § 184.

"A conspiracy makes each conspirator liable under the crim-
inal law for the act of each other conspirator done in pursuance
of such conspiracy." (Volume 2, Wigmore on Evi. sec. 1079.).

The only question as to the admissibility of this evidence
against petitioner White is as to whether or not there is any evi-
dence in the record tending to show a conspiracy between the
two petitioners to rob safes, as contended for by the Assistant
Attorney General. In volume 2, Wharton on Evi. § 1205, we find
the following:

"When a conspiracy is shown to exist, which is usually in-
ductively from circumstances, then the declarations of one con-
spirator in furtherance of the common design, as long as the
conspiracy continues, are admissible against his associates, though

made in the absence of the latter. *The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all."*

See, also, *Phillips v. State,* 6 Tex. App. 380; *Hannon v. State,* 5 Tex. 549.

In the case of *Starr v. State,* 5 Okla. Cr. 460, 115 Pac. 356, this question was passed upon by this court as follows:

"Slight evidence of collusion is all that is required. 2 Rice on Evd. 865, § 333; 1 Greenleaf on Evi. (13th Ed.) § 111; *Anarchist's Case,* 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320; *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447."

While there is no direct testimony of the existence of a conspiracy between petitioners as contended for by the Assistant Attorney General, and while it is true that the circumstances testified to in behalf of the state, if taken alone and simply by themselves, would have but little strength, yet, when all these circumstances are taken together, we are satisfied that this letter is admissible in evidence as against both of the petitioners. It has been expressly decided that written correspondence and entries made in books and other documents by one conspirator, having reference to the common design of the conspirators, are admissible in evidence against a co-conspirator. See *Carter v. State,* 106 Ga. 376, 32 S. E. 345, 71 Am. St. Rep. 262; *State v. Cardoza,* 11 S. C. 195; *Bloomer v. State,* 48 Md. 524. The conspiracy between petitioners would constitute one of the strongest possible motives for the killing of Arnett.

It is the theory of the state that this murder was committed in pursuance of a system or scheme of the petitioners to rob various safes in the state of Oklahoma, and especially in Pottawatomie county. In support of this theory, the state has introduced in evidence the fact that one of the petitioners, Hayes, was, at the time of the commission of this crime, and had been for some time prior thereto, an employee of the firm known as the Conger Safe Company, of Oklahoma City, Okla.; that said Hayes was an expert as to the combinations of safes; that as such employee he had obtained possession of a description of the combinations of numerous safes throughout the state of Oklahoma,

which had been disposed of to merchants and bankers by said safe company during the time of said Hayes' emloyment. This is a legitimate inference to be drawn from the fact that Hayes had in his possession, at the time of his arrest, a large ledger containing the combinations of over 150 safes; also concealed on his premises in Oklahoma, at the time of his arrest, were found some memorandum books, and in one of these the combination to the safe of the Seikel Mercantile Company, at McLoud, which safe had been bought from the Conger Safe Company, at Oklahoma, and which safe was in the building to which an entrance had been attempted by the men who murdered Arnett. In connection with this, it is well to note that the petitioner White had been repeatedly seen in Hayes' company on the streets of Oklahoma City at various times prior to his arrest in the month of September, 1911.

There can be no doubt that the purpose of the men who committed this crime was to burglarize the store of the Seikel Mercantile Company, at McLoud. At the time that they were discovered, this purpose had not been accomplished. It was therefore not necessary that the men who murdered Arnett, the night marshal, should do it for the purpose of concealing a crime, so some other motive must have been controlling. To our minds, the motive is apparent from this record. It will be noted that the accused White had been a resident of the town of McLoud, well knowing its places of business, and doubtless acquainted with its citizens. It also appears from the record that the town marshal, Arnett, had for several years been a resident of McLoud, and was well and widely known to all the people of that community. The accused White was the only person who did the shooting, and that this shooting did not occur until after the accused Hayes had passed out of the building in front of him. It is therefore reasonable to infer that as soon as the lantern was brought up, as the witness Bowman testified it was, to a position where the features of White could be seen that they would have been recognized by the deceased. The deceased was standing in the light of the lantern, and therefore could be recognized by a person

coming from the cellar before the deceased could distinguish the features of such person. The testimony shows that the last man who came out of the cellar had his face turned from the deceased as he came up, looking west, and that as soon as he got out of the cellar he immediately turned toward deceased and began firing. This is a most significant circumstance. It shows that this man recognized deceased, and avoided recognition by the deceased until he was ready to fire the fatal shot. The excuse that they were in the building hunting for a place to sleep, given by Hayes as he stepped out, would not be believed by Arnett, who knew White, and knew that he had a home in that county and did not need a place to sleep. The inference, therefore, is that White, having been discovered by Arnett in the act of burglarizing a store in a community where he was well known, found that the only means of escape was to kill the night marshal, and thereby forever close the mouth of the only man, except Hayes, his companion in crime, who could ever produce evidence of positive identity against him. The record shows that both men were strangers to the witness Bowman, who had moved to McLoud after White had left there.

The only eyewitness to this tragedy yet produced is Bowman, and his testimony, taken in connection with the inferences legitimately to be drawn from the other facts and circumstances surrounding this case, points directly to the guilt of Hayes and White. He describes the men that were seen by him there that night. In height and age, and practically as to weight and features, his description tallies with the description of Hayes and White. He says that he cannot positively identify them as the men he saw there that night. It would seem preposterous that any man could positively identify two total strangers, and the fact that he does say that he cannot positively identify them adds weight to his testimony, instead of detracting therefrom. It is also in evidence that the tracks of these two men leading away from the place of the crime were accurately measured, and that the tracks of White and Hayes made in the soil at Tecumseh after their arrest were also measured. The larger footprints at

the scene of the crime and leading away therefrom tally exactly, perfectly, with the measurement of the footprints of White as he made them in the soil at Tecumseh. As to Hayes, the witness testified that as to general appearance of tracks they were similar, but that from the measurement made, from the best of his opinion, there was a slight difference in the length, less than a quarter of an inch. The tracks at the scene of the crime were followed for five miles through the alleys and streets to the edge of the town, and then along highways and through the fields of cotton, etc., onto a highway crossing a railroad, where they disappeared entirely, and right along this highway was noticed the track of an automobile; and these tracks that led away from the scene of the crime led in the general direction of Oklahoma City, the home of Hayes, and the place where White had been seen frequently in Hayes' company on several occasions prior to his arrest.

It is also in evidence in this case that the man who came up out the basement first had a very peculiar shrug or affection of the shoulders, which was described by the witness Bowman, he saying that he had never noticed any action similar to that in any man; and this same witness says that when he noticed Hayes after his arrest at Tecumseh that he noticed a shrug or affection of the shoulder, and straightening up, that impressed itself upon his mind at the time this man came out of the basement. He says that these actions were alike.

Besides that, there is evidence in this case that was found at the home of Hayes at the time of his arrest (the record disclosing that Hayes and his wife lived at 135 West Fifth street, in Oklahoma City); this evidence being a letter, which is quoted in full in the synopsis of the testimony, *supra*. The letter was typewritten and unsigned. It was addressed to somebody by the name of Harry, as it starts out, "Dear Harry," and whoever that Harry was must have lived at Wanette, because at the bottom of the letter appeared the following: "How big is Wanette, and what towns are close around there?" This, taken in connection with the stipulation that White lived at Wanette, leads to the legitimate inference that Hayes was addressing White, and es-

pecially is this true since they had been seen together on various occasions in Oklahoma City, and the letter itself is unexplained. The entire testimony in this case sustains this view.

The state omitted to prove on the examining trial just when the arrest of Hayes was made, which should by all means have been proved, as it is a material fact in the case in connection with the letter which was offered in evidence; but this omission has been largely cured by the evidence of George Bowman to the effect that two or three weeks before the trial he saw the petitioners at Tecumseh, after their arrest. This trial began in the justice court on the 9th day of October, and if for the three weeks preceding this time they were in jail at Tecumseh then Hayes' arrest must have taken place about the date of the letter found in his home, which strongly indicates that it had just been written, but that Hayes had not had time to mail it. As before stated in this opinion, no one circumstance testified to by the witnesses against the petitioners would be sufficient to prove their guilt. In fact, each of these circumstances standing alone might be entirely consistent with innocence, but when they are all taken and combined together the conclusion is irresistible, to our minds, that these petitioners are not entitled to be discharged. While to a very limited extent a false consistency of circumstances may be constructed, yet experience teaches that this is almost impossible where there are a considerable number of circumstances involved.

We think that the application of the chain theory to circumstantial evidence is improper. No chain is stronger than its weakest link, and will never pull or bind more than its weakest link will stand. With its weakest link broken, the power of the chain is gone; but it is altogether different with a cable. Its strength does not depend upon one strand, but is made up of a union and combination of the strength of all its strands. No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight, but when these different strands are all combined together they support a structure which is capable of sustaining the weight of the heaviest engines and

trains. We therefore think that it is erroneous to speak of circumstantial evidence as depending upon links, for the truth is that in cases of circumstantial evidence each fact relied upon is simply considered as one of the strands, and all of the facts relied upon should be treated as a cable. Taking all the circumstances in this case in connection with the variety of sources from which they are derived, we do not see how they can be harmonized upon any other theory, save that petitioners are guilty of the crime charged. Petitioners are therefore remanded to the custody of the sheriff of Pottawatomie county to await trial on the charge now pending against them.

ARMSTRONG and DOYLE, JJ., concur.