WHITE v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:WHITE v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 WHITE v. STATE
2019 OK CR 2
437 P.3d 1061
Case Number: F-2017-343
Decided: 02/14/2019
ROY LEE WHITE JR., Appellant v. THE STATE OF OKLAHOMA, Appellee.
Cite as: 2019 OK CR 2, 437 P.3d 1061

 

 

O P I N I O N

KUEHN, JUDGE:

¶1 Appellant, Roy Lee White Jr., was convicted by a jury in Comanche County District Court, Case No. CF-2015-642, of Count 1: First Degree Murder (21 O.S.Supp.2012, § 701.7(A)) and Count 2: Possession of a Firearm After Conviction of a Felony (21 O.S.Supp.2014, § 1283). On April 4, 2017, the Honorable Gerald Neuwirth, District Judge, sentenced him in accordance with the jury's recommendation as follows: Count 1, life imprisonment without parole; Count 2, ten years imprisonment.[1] This appeal followed.

¶2 Appellant's convictions arise from the murder of Donald Brewer, on the evening of December 3, 2015, in a room at the Super 9 Motel in Lawton. Brewer died from multiple gunshot wounds to the head and chest. The motel room had been rented by Frank Crowley; Crowley was personally acquainted with both Appellant and Brewer. According to Crowley, Brewer was visiting with him when Appellant came to the room. Crowley said he knew there was some sort of disagreement between the two men about money. Crowley testified that Appellant and Brewer briefly argued about the perceived debt before Appellant brandished a black revolver, shot Brewer (who was unarmed) several times, and then fled. Brewer died at the scene.

¶3 As soon as he thought it safe to leave the room, Crowley ran across the street, where he saw a patrol car, and frantically told the officer that his friend had just been shot. Crowley described the gunman as wearing a red sweatshirt and carrying a black backpack. As another officer was responding to the scene, he saw Appellant walking away from the Super 9 Motel, wearing a tank top. The officer found that peculiar, as it was December and the weather was cold. When the officer tried to talk to Appellant, Appellant began to run, but he was eventually apprehended.

¶4 Appellant initially told police that he was running because he had heard gunshots. He later told a detective that he had gone to the Super 9 Motel to see his friend "Short," and that he was standing in the doorway of Short's room when he heard gunshots. The detective knew Crowley, and knew that Crowley's nickname was "Short."

¶5 When police searched pathways leading away from the motel, they found a sweatshirt and backpack in the grass behind a nearby building. According to the officer who found them, they appeared to have recently been discarded there, because there was moisture on the surrounding grass but the sweatshirt and backpack were dry. The backpack contained a quantity of marijuana and a .32 caliber revolver.

¶6 At trial, Crowley testified that the revolver police found in the backpack looked like the gun Appellant used to shoot Brewer. It was the same color as the one Crowley described, and had a small loop (known as a "lanyard ring") at the bottom of the grip, as Crowley described. Crowley said that Appellant shot at Brewer until he ran out of bullets; the cylinder of the found revolver was full of empty shells. A state ballistics examiner testified that the pistol was operable, but she could not determine whether the one bullet fragment retrieved from the crime scene had been fired by that pistol, because the fragment was too damaged to make a comparison. The examiner did, however, conclude that the fragment had the same class characteristics as bullets that would fit the revolver.

¶7 Police obtained swabs from Appellant's hands and face to test for gunshot residue. They also submitted the revolver, backpack, and sweatshirt, as well as a buccal swab from the inside of Appellant's cheek, to the Oklahoma State Bureau of Investigation to attempt a DNA comparison. At trial, the criminalist who conducted the tests explained that Appellant was excluded as the donor of DNA recovered from the backpack, and that the sample obtained from the sweatshirt was simply not suitable for analysis. However, Appellant's DNA was consistent with traces found on the revolver. The criminalist testified that the odds of finding a "random match" between the revolver sample, and an unrelated individual in the general population, were 1 in 26. The gunshot-residue (GSR) test detected particles swabbed from Appellant's face which were comprised of a mixture of lead, barium, and antimony -- elements found in gunshot residue, and not normally attributable to any other source.

¶8 Appellant did not testify. The jury found him guilty as charged of First Degree Murder. After an additional proceeding where evidence of Appellant's prior convictions was introduced, the jury also found him guilty of Possessing a Firearm After Felony Conviction.

¶9 In his first two propositions of error, Appellant claims the evidence was insufficient to support either of his convictions. That Appellant is a convicted felon (a necessary element of Count 2) is not disputed; he only challenges the jury's finding that he was the person who possessed the firearm (Count 2) and used that firearm to kill Brewer (Count 1). Given that the State's evidence either tends to prove both crimes or neither, we consider these claims together. Our task is not to re-weigh the evidence to our own satisfaction, but to determine if, from the evidence presented at trial, a rational juror could have found the elements of each crime by proof beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Hogan v. State, 2006 OK CR 19, ¶ 21, 139 P.3d 907, 919.[2]

 

¶10 Appellant claims that the physical evidence linking him to the crime was inconclusive, and that the testimony of Frank Crowley should be disregarded because he was a convicted felon whose testimony was fraught with inconsistency. We disagree. The results of the DNA comparisons were certainly not as strong here as in some other cases; only one of the three unknown samples was even suitable for comparison, and that one (from the pistol) was determined to be a mixture of DNA from more than one source, which materially affected the probative value of any comparison to Appellant's known sample. Nevertheless, the statistical evidence indicated that Appellant was 26 times more likely to have contributed DNA on the pistol than someone else, unrelated to him, chosen at random from the general population.[3] Furthermore, the GSR test revealed telltale (albeit circumstantial) evidence on Appellant's face that he had recently been in close proximity to the discharge of a firearm.[4]

¶11 Appellant takes a "divide and conquer" approach to the State's evidence, compartmentalizing it and pointing to perceived weaknesses in each category. But the jury was instructed to consider the evidence as a whole, and we must do the same. Matthews v. State, 2002 OK CR 16, ¶ 35, 45 P.3d 907, 919-920. Crowley's testimony was direct evidence of Appellant's guilt. When direct testimony comes from an eyewitness, the dangers of mistake or intentional falsehood are always a possibility. Any theory that Crowley innocently misidentified Appellant as the culprit is counterbalanced by the fact that he knew Appellant personally. As for the possibility that Crowley simply lied about Appellant's guilt, Crowley's status as a felon is relevant to his general credibility, but it is counterbalanced by the absence of any known motive for him to falsely accuse Appellant of murder. Crowley's credibility may also have been negatively affected by his history of mental health problems, but the issue was explored at trial.

 

¶12 Crowley's credibility as a whole is bolstered by how his claims meshed with other evidence, some of it (but not all) circumstantial in nature. Circumstantial evidence can be very powerful, given that its probative force is usually derived from inferences drawn from a web of unrelated facts. Weaknesses in one or more pieces of evidence may be overcome if, when all the facts are considered together, they present a unified and convincing theory of guilt.[5] Near the murder scene, police found an abandoned pistol which matched Crowley's description of the murder weapon in unique ways. Not only did Crowley describe the revolver's "lanyard ring," but the empty shells in the pistol's chamber corroborated Crowley's account that the shooter fired until he ran out of bullets. DNA retrieved from the gun could have been Appellant's, even though the statistical probabilities were not as strong as seen in some other cases. The defense made much of the fact that the sweatshirt was not the same color as the one Crowley described. But Crowley explained why he might have been mistaken about its color: "I wasn't looking at what he was wearing. I was looking at the gun." Appellant was observed running away from the motel shortly after the shooting, wearing a tank top in winter weather. His path was consistent with where the sweatshirt, backpack, and gun were found, such that he could have deposited the items along the way.

¶13 The jury had yet another piece of direct evidence to consider: Appellant's own statements to police. Appellant admitted that he was standing in the doorway of a motel room rented by someone he called "Short" when he heard gunshots and fled. Crowley's nickname was "Short." Appellant did not admit the shooting, nor did he claim to know who the shooter was, but his unsolicited admission to actually being at the scene is certainly peculiar and raises suspicion when considered in light of all the other evidence in the case. The ultimate question is whether all of this evidence, taken together, excludes any reasonable probability that Appellant was not the shooter. We believe a rational juror could conclude, beyond any reasonable doubt, that Appellant (a felon) possessed a firearm, and that he used that firearm to kill Brewer with malice aforethought. Propositions I and II are denied.

¶14 In Proposition III, Appellant claims the trial court erred in failing to instruct the jury on Second Degree, Depraved Mind Murder as an alternative to First Degree, Malice Murder. Appellant did not request this alternative at trial, so we review this claim for plain error. McHam v. State, 2005 OK CR 28, ¶ 21, 126 P.3d 662, 670. Plain errors are those errors which are obvious in the record, and which affect the substantial rights of the defendant -- that is, the error affects the outcome of the proceeding. Daniels v. State, 2016 OK CR 2, ¶ 3, 369 P.3d 381, 383. In the context of lesser-related offense instructions, relief is not warranted unless a rational juror could have rejected elements that distinguish the charged crime from the lesser alternative. McHam, 2005 OK CR 28, ¶ 21, 126 P.3d at 670. Appellant maintained that he was innocent of the charges. The State's evidence clearly established that the person who shot Brewer did so with the intention of killing him; Crowley testified that the assailant (whom he identified as Appellant) exclaimed, "No one told you that I was a killer" before he started shooting. When Brewer fled into the bathroom and shut the door, the assailant rebuffed Crowley's pleas to stop, saying, "I'm going to kill him" before firing through the bathroom door. Crowley said Appellant fired until he had no bullets left; Brewer sustained four gunshots to the head and torso. On these facts, no rational juror could have concluded that the shooter acted merely with a "depraved mind, regardless of human life"; evidence of malice was overwhelming. 21 O.S.2011, § 701.8(1); Simpson v. State, 2010 OK CR 6, ¶¶ 16-18, 230 P.3d 888, 897. Proposition III is denied.

¶15 In Proposition IV, Appellant claims he was denied a fair trial by the admission of evidence suggesting he was generally a bad person who deserved punishment. He cites the general rule against introducing evidence of his other crimes, wrongs, or bad acts to show that he acted in conformity therewith. 12 O.S.2011, § 2404(B). Appellant did not object to these comments below, so we review them only for plain error. Appellant must show a plain or obvious deviation from a legal rule which affected his substantial rights. We will only grant relief if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings, or otherwise represents a miscarriage of justice. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923. Crowley testified that the dispute between Appellant and Brewer had to do with a debt over bond money that one man apparently owed to the other. When explaining the disagreement, Crowley suggested that Appellant had outstanding warrants for his arrest, although he did not elaborate further. Initially, it is questionable whether this qualifies as other crimes evidence, or was merely a non-prejudicial suggestion of unspecified wrongdoing. See Bear v. State, 1988 OK CR 181, ¶ 22, 762 P.2d 950, 956 (references only noticeable to defense counsel do not constitute other-crimes evidence). In any event, we find this brief comment admissible as part of the res gestae, as it helped explain (in Crowley's estimation) the substance of the disagreement which erupted into a shooting. Baird v. State, 2017 OK CR 16, ¶ 38, 400 P.3d 875, 885-86. Appellant's remaining complaints pertain to testimony about possible gang affiliation which defense counsel herself elicited when cross-examining State's witnesses. We will not find plain error where it was defense counsel who deviated from the rules.[6] Cuesta-Rodriguez v. State, 2010 OK CR 23, ¶ 101, 241 P.3d 214, 244. There was no plain error here, and Proposition IV is denied.

¶16 In Proposition V, Appellant claims the trial court erred in admitting evidence of a gunshot-residue (GSR) test, because the swabs taken from his face and hands and used for that test were obtained without a search warrant, and therefore constitutionally prohibited. Searches for evidence conducted without a warrant are presumptively unreasonable under the Fourth Amendment. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

¶17 Appellant did not challenge the GSR procedure on these grounds below. We generally review unpreserved claims for plain error. Mitchell v. State, 2016 OK CR 21, ¶ 24, 387 P.3d 934, 943. Since this claim implicates the constitutional right to be free from unreasonable searches, our plain-error review is governed by Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Miller v. State, 2013 OK CR 11, ¶¶ 104, 106, 313 P.3d 934, 971-72.[7] The first step in any plain-error review is to determine if a deviation from a legal rule is plain, or obvious, from the record before us. Barnard v. State, 2012 OK CR 15, ¶ 25, 290 P.3d 759, 767.

¶18 Because Appellant did not raise this claim below, the record is not fully developed on this issue. Challenges to the admissibility of evidence, often on constitutional grounds (e.g., the voluntariness of a defendant's confession, the legality of a police search), are usually matters for the court -- not the jury -- to determine. 12 O.S.2011, § 2105(A). Hence they are usually considered before trial, or at in camera hearings during trial, and involve issues that are not always developed at the trial itself. If no timely challenge is made to the admissibility of the evidence, and an admissibility challenge is raised for the first time on appeal, then the appellate court may be forced to guess at the answers to questions that are dispositive to the analysis it is being asked to conduct.[8] Here, the circumstances surrounding the taking of the GSR swabs might establish facts relevant to our analysis, but these issues were never developed below.[9] Where the record is not sufficient to confidently resolve a claim, any alleged error is unlikely to be plain or obvious.

¶19 Nevertheless, despite the limited record here, analysis of the central issue is achievable and appropriate. Does the warrantless swabbing of an arrestee's face and hands for possible gunshot residue amount to an unreasonable search prohibited by the state and federal constitutions? We believe it does not. Appellant cites no controlling or even persuasive authority holding that such GSR swabbing techniques, applied to the surfaces of the fingers and face of an arrestee, are an unreasonable invasion of, or interference with, bodily integrity. As described in the trial record, evidence is collected by swabbing the face and hands of the suspect with special pads, and then examining the pads under an electron microscope for certain peculiar combinations of inorganic particles. The procedure employed in this case did not intrude into Appellant's body, nor did it expose any part of his body not normally exposed to public view. Furthermore, its purpose was not to collect any information about the suspect's body, only to harvest inert debris from its surface.[10]

¶20 The fact that Appellant was under arrest at the time the swabs were collected is of key significance here. We believe the swabbing of an arrestee's face and extremities for gunshot residue is a reasonable and proper "search incident to arrest." A number of jurisdictions have reached the same result.[11] This exception to the Fourth Amendment's preference for prior judicial approval of a search is rooted in history and practicality. When a suspect is lawfully arrested, his person and any area in his immediate control may be searched to prevent danger to the arresting officer or others (e.g. from hidden weapons), and to prevent the suspect from destroying evidence. See Arizona v. Gant, 556 U.S. 332, 339, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009); Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); State v. Thomas, 2014 OK CR 12, ¶ 5, 334 P.3d 941, 943-44.

 

¶21 A search incident to arrest is permitted categorically; that is, it does not depend on individualized suspicion. "The fact of a lawful arrest, standing alone, authorizes a search." Maryland v. King, 569 U.S. 435, 449, 133 S.Ct. 1958, 1971, 186 L.Ed.2d 1 (2013) (citation omitted). However, even such routine procedures must be "reasonable" in the scope of intrusion. See Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973) ("the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement"). In Cupp, the United States Supreme Court concluded that police were authorized in collecting scrapings from under the suspect's fingernails because they had probable cause to arrest him for his wife's murder. Even though the defendant in Cupp was not formally under arrest at the time of the search, we find the analysis in that case instructive here. As here, Cupp involved the mere harvesting of particles from the surface of the suspect's body.[12] We conclude that GSR swabs of a lawfully arrested suspect's body surface are permissible without regard to individualized suspicion, exigent circumstances, probable cause, or prior judicial approval. Proposition V is denied.

¶22 In Proposition VI, Appellant challenges the trial court's restitution award at sentencing. The court ordered Appellant to pay $4,966.50 to the Crime Victim's Compensation Fund. The record includes no indication as to how this figure was calculated. A restitution order may only include those losses which are determinable with reasonable certainty. Honeycutt v. State, 1992 OK CR 36, ¶ 31, 834 P.2d 993, 1000; 22 O.S.Supp.2014, § 991a(A)(1)(a); 22 O.S.2011, § 991f.[13] Appellant did not object to the restitution award below, so we review only for plain error. Hogan, 2006 OK CR 19, ¶ 38, 139 P.3d at 923. We find (and the State concedes) that the trial court plainly erred in assessing restitution without some record evidence to support the award, and we further find that Appellant was financially prejudiced by the assessment. The restitution award is therefore VACATED.

¶23 In Proposition VII, Appellant claims he was denied his Sixth Amendment right to reasonably effective trial counsel. His first set of complaints are based on the record made below. To obtain relief, Appellant must establish both deficient performance and a reasonable probability of resulting prejudice. In other words, he must show that counsel made an objectively unreasonable decision which undermines confidence in the outcome of the trial. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); Sanchez v. State, 2009 OK CR 31, ¶ 98, 223 P.3d 980, 1012. Failure to prove either deficient performance or resulting prejudice is fatal to an ineffective-counsel claim. Malone v. State, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206.

¶24 Appellant claims trial counsel was ineffective for failing to preserve the complaints raised in Propositions I through VI. Propositions I and II challenged the sufficiency of the evidence supporting Appellant's convictions; trial counsel adequately preserved those challenges by demurring to the State's evidence. Counsel's failure to request instructions on Second Degree Murder (Proposition III) was not prejudicial, since neither the State's evidence nor the defense theory reasonably supported them. Counsel's failure to object to references to Appellant's outstanding warrants, and counsel's own exploration of the gang affiliations of various parties (Proposition IV), do not establish deficient performance; the former were properly admitted as part of the res gestae, and the latter were counsel's reasonable attempt to impeach the credibility of the State's chief witness and demonstrate his bias. Counsel's failure to challenge the taking of the GSR swabs as an unconstitutional search resulted in no prejudice; we rejected that claim on the merits in Proposition V. Counsel's failure to require evidence to support the restitution award (Proposition VI) may have been deficient performance, but the issue is moot since we have granted relief on that claim. Miller v. State, 2013 OK CR 11, ¶ 243, 313 P.3d 934, 1004-05.

¶25 Appellant's next set of complaints about his trial counsel involve matters outside the record, which he has provided in an Application for Evidentiary Hearing, pursuant to Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018). Our task here is not to conclusively decide whether trial counsel rendered deficient performance, but only to decide whether the materials submitted in support of that claim show, by clear and convincing evidence, a strong possibility that trial counsel was ineffective for failing to utilize or identify the evidence in question, such that further fact-finding, through an evidentiary hearing, is warranted. Rule 3.11(B)(3), id.

¶26 Appellate defense counsel provides video interviews and affidavits from two people who suggested that Appellant was not responsible for Brewer's murder.[14] Both interviews were conducted by law enforcement during the investigation of this case. Appellant claims that counsel should have done something with this evidence at trial. There are several problems with this argument. First, neither witness claimed to have personal knowledge of who killed Brewer, but rather reported what they had heard. Second, setting aside the hearsay problems, the two accounts of who might have been involved in the murder were not consistent with each other, and neither was particularly coherent in itself. Third, neither account is supported by corroborating evidence of any kind.[15] Finally, neither witness claims they would be willing to testify in court. In fact, appellate counsel filed their statements under seal, claiming their lives would be jeopardized if their accusations were made public. There was little, if any, practical use for defense counsel to eke out of this information.[16]

¶27 Appellant also submits crime-scene photographs provided to trial counsel in discovery which, he claims, suggest the possibility of cross-contamination of physical evidence. Police collected evidence at the motel room where Brewer was murdered; they also found a sweatshirt, backpack, and pistol behind a nearby building. From the photographs Appellant submits, it appears that (1) police removed the pistol from the backpack, removed shells from the pistol, and photographed the pistol and shells lying on top of the sweatshirt; and (2) police took the pistol to the motel room and photographed it resting on a bed inside the room (with an evidence sack shielding the pistol from the bedspread).

 

¶28 Appellant claims these photographs indicate the possibility of cross-contamination of DNA material among different pieces of evidence. As for the pistol and shells lying on top of the sweatshirt, it is unclear how this could have caused any contamination. No usable DNA was retrieved from the sweatshirt, and there is no evidence that the shells themselves were even tested. As for the pistol photographed in the motel room, the implication seems to be that the DNA retrieved from it could have been picked up from the motel bed, i.e. in the immediate area where Brewer was shot. But Appellant never claimed any connection to the gun. Given that DNA found on the gun was consistent with Appellant's profile to some degree, a claim of possible cross-contamination between the gun and the motel bedspread could easily have backfired (so to speak), because the only way Appellant's DNA could have gotten on the bed (later to be transferred to the gun) was if he had, in fact, been exactly where the shooting occurred, as Crowley testified. In conclusion, the supplementary materials Appellant has presented to this Court do not show, by clear and convincing evidence, a strong possibility that trial counsel was ineffective, to the extent that additional fact-finding on the issue would be warranted. Rule 3.11(B), Rules of the Oklahoma Court of Criminal Appeals; Simpson v. State, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06. Appellant's request for an evidentiary hearing is DENIED, and Proposition VII is also denied.

¶29 In Proposition VIII, Appellant claims his sentences are excessive under the circumstances. He specifically claims the trial court abused its discretion when it ordered his ten-year sentence on Count 2 to be served consecutively to his sentence of life imprisonment without parole on Count 1. We disagree. The jury imposed the maximum terms available for both crimes after being properly instructed on the matter.[17] If one believes Crowley's version of events, Appellant shot an unarmed man over a debt. The evidence did not support a conclusion that the homicide was planned in advance, but once the shooting started, it did not stop until the gun was empty. Crowley testified he tried to stop the shooting, and tried to help Brewer hide in the bathroom as the bullets flew; the gunman continued firing at the bathroom door. Considering all the facts and circumstances, we cannot say the jury's sentence recommendation is shocking to the conscience, or that the trial court abused its discretion in ordering consecutive service. Rea v. State, 2001 OK CR 28, ¶ 5, 34 P.3d 148, 149; Henderson v. State, 1985 OK CR 22, ¶ 25, 695 P.2d 879, 884. Proposition VIII is denied.

¶30 In Proposition IX, Appellant claims the cumulative effect of all errors previously raised warrants relief. We identified one plain error in Proposition VI, and have already granted the appropriate relief. See Bell v. State, 2007 OK CR 43, ¶ 14, 172 P.3d 622, 627. Having identified no errors in the remaining claims, we have no error to accumulate. Sanders v. State, 2002 OK CR 42, ¶ 17, 60 P.3d 1048, 1051. Proposition IX is denied.

DECISION

¶31 The Application for Evidentiary Hearing on Sixth Amendment Claim is DENIED. The District Court's restitution award is VACATED. In all other respects, the Judgment and Sentence of the District Court of Comanche County is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2019), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF COMANCHE COUNTY
THE HONORABLE GERALD NEUWIRTH, DISTRICT JUDGE

 
 
 ATTORNEYS AT TRIAL
 ATTORNEYS ON APPEAL
 
 
  
  
 
 
 TERESSA WILLIAMS
 KATRINA CONRAD-LEGLER
 
 
 P.O. BOX 2095
 HOMICIDE DIRECT
 
 
 1309 W. GORE BLVD.
 APPEALS DIVISION
 
 
 LAWTON, OK 73502
 OKLA. INDIGENT DEFENSE SYS.
 
 
 COUNSEL FOR DEFENDANT
 P.O. BOX 926
 
 
  
 NORMAN, OK 73070
 
 
 KYLE CABELKA
 COUNSEL FOR APPELLANT
 
 
 EVAN WATSON
  
 
 
 ASST. DISTRICT ATTORNEYS
 MIKE HUNTER
 
 
 COMANCHE CO. COURTHOUSE
 ATTORNEY GENERAL OF OKLA.
 
 
 LAWTON, OK 73501-4360
 TESSA L. HENRY
 
 
 COUNSEL FOR THE STATE
 ASST. ATTORNEY GENERAL
 
 
  
 313 NE 21ST STREET
 
 
  
 OKLAHOMA CITY, OK 73105
 
 
  
 COUNSEL FOR APPELLEE
 
 

 

OPINION BY KUEHN, V.P.J.

LEWIS, P.J.: CONCUR
LUMPKIN, J. : CONCUR IN RESULTS
HUDSON, J.: CONCUR
ROWLAND, J.: CONCUR

FOOTNOTES

[1] The trial court ordered the two sentences to be served consecutively.

[2] Appellant also asks us to consider whether the evidence for Count 1 alternatively supported a conviction for Second Degree Murder, and he asks us to consider material which was not presented to his jury. We defer consideration of those issues to Propositions III and VII, respectively; here we focus on whether the evidence presented at trial supports convictions for the charged crimes.

[3] DNA experts typically give the "random match probability," which is the likelihood of finding a match between the unknown sample and an unrelated person in the general population. This ratio, by itself, contains no information and provides no inference about the suspect; it is based solely on comparing the sample to a database of genetic profiles. A more relevant piece of data is the "likelihood ratio," which assumes that the suspect's profile matches the sample. Given that the suspect has the same profile, the likelihood ratio estimates how much more likely it is that he is the source of the evidence, as opposed to some randomly selected member of the population unrelated to him. See State v. Bander, 208 P.3d 1242, 1250 (Wash.App. 2009) (emphasis added). In the usual case, "the likelihood ratio is the reciprocal of the probability of a random match." Id. (citation omitted). Here, the OSBI's DNA expert testified that the odds of finding a random match between the revolver sample, and an unrelated individual in the general population, were 1 in 26.

[4] Appellant makes much of the fact that only five particles of gunshot residue were detected, but this ignores the import of the relevant expert testimony. The criminalist who analyzed the GSR swabs testified that each "stub" is examined under an electron microscope for particles comprised of three particular elements. Due to workload constraints, the examination is concluded once five particles are detected. This does not mean that only five such particles adhered to the swab.

[5] In Ex parte Hayes, 6 Okl.Cr. 321, 118 P. 609, 614 (1911), Judge Furman described the situation this way:

No chain is stronger than its weakest link, and will never pull or bind more than its weakest link will stand. With its weakest link broken, the power of the chain is gone; but it is altogether different with a cable. Its strength does not depend upon one strand, but is made up of a union and combination of the strength of all its strands. No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight, but when these different strands are all combined together they support a structure which is capable of sustaining the weight of the heaviest engines and trains. We therefore think that it is erroneous to speak of circumstantial evidence as depending upon links, for the truth is that in cases of circumstantial evidence each fact relied upon is simply considered as one of the strands, and all of the facts relied upon should be treated as a cable.

[6] It appears defense counsel was attempting to impeach Crowley's credibility by showing some sort of gang-related bias. Defense counsel merely asked Crowley if he "believed" Appellant was in a criminal gang; Crowley's reply was, "I already knew he was a gang member." Counsel followed up by asking about the gang affiliations of Crowley himself, as well as of Brewer and members of Crowley's family. Defense counsel may have initially received more of an answer from Crowley than she intended, but the fact remains, she opened the door to Appellant's possible gang affiliation. Defense counsel also elicited testimony from Detective Diaz concerning the gang affiliations of others besides Appellant. In Proposition VII, Appellant faults trial counsel for not presenting evidence that he had ties to a street gang.

[7] Chapman requires that, any error of constitutional importance, whether or not it is preserved for objection, cannot be held harmless unless the State shows that it was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24, 87 S.Ct. at 828.

[8] In such situations, we have often declined to attempt any further analysis of the issue belatedly raised, as it is the defendant's responsibility to present this Court with sufficient record to address any claim brought on appeal. See e.g. Ferguson v. State, 1984 OK CR 32, ¶ 3, 675 P.2d 1023, 1025-26 (admissibility of eyewitness identification); Dollar v. State, 1984 OK CR 1, ¶ 7, 674 P.2d 48, 50 (declaration of mistrial); Pierce v. State, 1972 OK CR 82, ¶ 6, 495 P.2d 407, 409 (legality of residential search). See also United States v. Easter, 981 F.2d 1549, 1556 (10th Cir. 1992) ("plain error review is not appropriate when the alleged error involves the resolution of factual disputes"); United States v. Smith, 131 F.3d 1392, 1397 (10th Cir. 1997) (plain-error review unavailable without sufficient factual development of the issue below).

[9] For example, while it appears from the record that no warrant was sought to conduct the swabs, we do not know if Appellant verbally consented to them -- and a valid consent would vitiate any Fourth Amendment concerns. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); Underwood v. State, 2011 OK CR 12, ¶ 33, 252 P.3d 221, 238. Furthermore, as Appellant concedes, "exigent circumstances" may permit the search or seizure of evidence from a suspect's body without a warrant. See generally Missouri v. McNeely, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). But whether such exigencies were present here is unknown, because -- again -- there was no timely Fourth Amendment challenge, and no hearing to develop such evidence. Appellate defense counsel hints at these problems by admitting the record is not "completely clear" on the sequence of events leading up to the taking of the swabs.

[10] Appellant analogizes GSR swabs to the taking of buccal swabs for DNA testing, which the United States Supreme Court has held is sufficiently invasive to constitute a "search" of the suspect's body, therefore falling under the purview of the Fourth Amendment. See Maryland v. King, 569 U.S. 435, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). But even in King, the harvesting of identifying genetic material from an arrestee, without a warrant, was condoned. The buccal swabs in King were taken pursuant to a Maryland law requiring anyone arrested for a serious crime to provide a DNA sample. The Court weighed the characteristics of the intrusion against the legitimate needs of law enforcement, and concluded that while the warrantless buccal swab was indeed a "search," it was not an "unreasonable" one under the circumstances. Id. at 463-64, 133 S.Ct. at 1979.

[11] See e.g. Comm. v. Simonson, 148 A.3d 792, 798-801 (Pa.Super. 2016); Jones v. State, 74 A.3d 802, 812-13 (Md.App. 2013) and cases cited at n.8 therein; United States v. Johnson, 445 F.3d 793, 795-96 (5th Cir. 2006).

[12] The fact (established at trial) that gunshot residue can quickly be cast off, or brushed off, suggests a GSR swab might be permitted under the "exigent circumstances" exception to the Fourth Amendment's warrant requirement. In Cupp, the Supreme Court emphasized not only that the police had probable cause to arrest the suspect for his wife's murder, but also the particular exigencies of the situation: after refusing the officers' request to inspect his fingertips, the suspect began rubbing his hands together and then thrust them into his pockets, which prompted the officers to restrain him and conduct their search. Cupp, 412 U.S. at 296, 93 S.Ct. at 2004. If Appellant had not been under arrest at the time the swabs were taken, the exigencies of the situation might bear on our analysis -- although, again, the record was not developed on this point because Appellant did not raise his constitutional challenge below. But the undisputed fact that Appellant was lawfully under arrest at the time of the swabbing is all that is needed to fulfill the "incident to arrest" exception.

[13] While the law allows a victim to be compensated for up to three times his economic loss, 22 O.S.2011, § 991f, obviously that calculation must begin with some relatively concrete assessment of loss.

[14] These materials also include a list of claims purportedly from a third person, but this document is neither signed nor notarized, and we decline to consider it.

[15] Witness 1 was interviewed in a Texas jail at the request of Lawton authorities. He refused to divulge the name of the supposed killer. He claimed his life would be in jeopardy if he did -- but then he also claimed the information was valuable, and that Lawton authorities would "make a lot of money" if he exposed the culprit. On the other hand, Witness 1 suspected Lawton authorities would just dismiss him as "some loony" because he was jailed in the "psych tank." He said Appellant and Brewer were friends, but conversely claimed Appellant voluntarily took the blame for Brewer's murder out of obligation to his (Appellant's) gang -- and was willing to spend the rest of his life in prison, for a crime he did not commit, because it was safer than being on the streets with the information he knew about the real killer. At one point, Witness 1 claimed a woman (whom he also refused to name) was the mastermind of Brewer's murder. He claimed he was "more of a detective than the detectives," and said that "he had the answer." "What it all comes down to," Witness 1 said, is the Comanche County Sheriff. He began describing a vast conspiracy, a "deep intricate circle" involving the sheriff, who (he claimed) was the head of a methamphetamine distribution network. Witness 1 said he feared being killed if he testified on Appellant's behalf, and suggested he might disavow anything he had said if forced to testify.

Witness 2 had a different account, claiming she had "heard" Brewer was killed by someone other than Appellant in retaliation for Brewer's rape of the murderer's daughter. This witness, an admitted methamphetamine user who was in jail at the time of her police interview, claimed this other suspect -- whom she never met until two months after Brewer's death -- sexually assaulted her and claimed, during the assault, that he had killed Brewer. Witness 2 claimed this person admitted to "emptying the clip" into Brewer's face. The interviewing detective explained to Witness 2 that that was not how Brewer was killed (the gun used to kill Brewer was not a firearm with a "clip," and no shells were found at the scene). After the interviewing detective explained his knowledge of the same people this witness knew, and the circumstances surrounding Brewer's death, Witness 2 appeared to change her mind and believe Appellant was, in fact, the culprit. She conceded that the alternative suspect may have just been trying to scare her, and to give himself "street credibility" by claiming he had killed a man. Witness 2 also bolstered Crowley's credibility to some extent: she was personally acquainted with him, and agreed he was a de facto mediator among various gang factions in Lawton.

[16] In fact, the record shows that defense counsel did the best she could with this information. The only witness presented by the defense was the lead detective on the case. After eliciting various facts to impeach the credibility of eyewitness Crowley, defense counsel questioned the detective about video interviews with people who claimed to have information about other possible suspects, even after Appellant was bound over for trial -- thus attempting to show that police had concerns about whether they had the "right man," even after Appellant was formally charged.

[17] Appellant claims concurrent sentencing is in order because, in the punishment stage, the jury asked the trial court, "Does the 10 years go on top of life with parole," and the trial court responded, "You have received all the evidence and instructions that apply in the case." The trial court's response was entirely proper: that decision was within the trial court's discretion, not the jury's. Appellant suggests the jurors sentenced him to life without parole because they were "confused," but there was no confusion here. It is indeed possible that, having received the court's answer, the jury wanted to make sure Appellant spent the rest of his life in prison, but that decision was not the product of any missing or erroneous information.

 

 

LUMPKIN, JUDGE: CONCUR IN RESULTS

¶1 I concur in affirming the Judgment and Sentence in this case but write separately. While I agree that GSR swabbings can legally be taken from a defendant as incident to a lawful arrest, I find two objections to the analysis raised in Proposition V.

¶2 First, because no objection to the GSR swabs was made at trial and no record developed to explain how and when the swabs were taken, the issue is waived for all but plain error review. If the allegation meets all of the requirements for review under the Simpson and Hogan test, a harmless error analysis may be applied. However, the plain error analysis does not begin by categorizing the type of harmless error analysis that will be applied. If a waived error satisfies all the requirements to receive plain error review, and the error is a constitutional error, then I agree that an analysis under Chapman applies.

¶3 Since the opinion admits no objections were made to the GSR swabs and the record was not sufficiently developed in this case to make an adjudication on the facts, then no error has been shown and the discussion in Proposition V is mere dicta and renders our opinion merely advisory. This Court has historically refused to give advisory opinions. Canady v. Reynolds, 1994 OK CR 54, ¶ 9, 880 P.2d 391, 394; Matter of L.N., 1980 OK CR 72, ¶ 3, 617 P.2d 239, 240. Our decisions must be made on the facts of each case and not on speculation or mere opinion. For those reasons, footnote 12 should be deleted and the broad all in-compassing sentence at the conclusion to Prop. V should be refined to fit the facts set out in the opinion.

¶4 I continue to believe the law dictates that material placed in footnotes is mere dicta and cannot be a holding of the Court. See Mathis v. State, 2012 OK CR 1, ¶ 5, 271 P.3d 67, 79 (Lumpkin, J. concurring in result); Taylor v. State, 2011 OK CR 8, ¶ 3, 248 P.3d 362, 380 (Lumpkin, J., concurring in result); Jackson v. State, 2006 OK CR 45, ¶ 1, 146 P.3d 1149, 1168 (Lumpkin, V.P.J., concurring in result); Cannon v. State, 1995 OK CR 45, ¶ 2, 904 P.2d 89, 108 (Lumpkin, J., concurring in result). Setting forth the law in footnotes leads to confusion as to what is controlling precedent. Such confusion can be extinguished by properly placing the holding of the Court in the body of the opinion where it belongs.

¶5 Footnotes can be distracting and take the readers' focus away from the main issues of the case. For example, footnotes 14 and 15 in this case refer to material outside the record; material which is not proper for this Court's consideration in the resolution of this appeal. Therefore, I find footnotes 14 and 15 in particular unnecessary.

¶6 Additionally, in Proposition VI, I find that instead of merely vacating the restitution award, the assessment should be remanded to the District Court for a proper determination of restitution.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2019 OK CR 17, HOLTZCLAW v. STATE
Discussed


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1988 OK CR 181, 762 P.2d 950, BEAR v. STATE
Discussed
 1992 OK CR 36, 834 P.2d 993, HONEYCUTT v. STATE
Discussed
 1994 OK CR 54, 880 P.2d 391, CANADY v. REYNOLDS
Discussed
 1995 OK CR 45, 904 P.2d 89, CANNON v. STATE
Discussed
 1911 OK CR 301, 118 P. 609, 6 Okl.Cr. 321, Ex parte Hayes
Cited
 2001 OK CR 28, 34 P.3d 148, 72 OBJ 2959, REA v. STATE
Discussed
 2002 OK CR 16, 45 P.3d 907, MATTHEWS v. STATE
Discussed
 2002 OK CR 42, 60 P.3d 1048, SANDERS v. STATE
Discussed
 2005 OK CR 28, 126 P.3d 662, McHAM v. STATE
Discussed at Length
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed at Length
 2006 OK CR 45, 146 P.3d 1149, JACKSON v. STATE
Discussed
 2007 OK CR 43, 172 P.3d 622, BELL v. STATE
Discussed
 2009 OK CR 31, 223 P.3d 980, SANCHEZ v. STATE
Discussed
 2010 OK CR 6, 230 P.3d 888, SIMPSON v. STATE
Discussed at Length
 2010 OK CR 23, 241 P.3d 214, CUESTA-RODRIGUEZ v. STATE
Discussed
 2011 OK CR 8, 248 P.3d 362, TAYLOR v. STATE
Discussed
 2011 OK CR 12, 252 P.3d 221, UNDERWOOD v. STATE
Discussed
 2012 OK CR 1, 271 P.3d 67, MATHIS v. STATE
Discussed
 2012 OK CR 15, 290 P.3d 759, BARNARD v. STATE
Discussed
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed
 2013 OK CR 11, 313 P.3d 934, MILLER v. STATE
Discussed at Length
 2014 OK CR 12, 334 P.3d 941, STATE v. THOMAS
Discussed
 2016 OK CR 2, 369 P.3d 381, DANIELS v. STATE
Discussed
 2016 OK CR 21, 387 P.3d 934, MITCHELL v. STATE
Discussed
 2017 OK CR 16, 400 P.3d 875, BAIRD v. STATE
Discussed
 1980 OK CR 72, 617 P.2d 239, MATTER OF L.N.
Discussed
 1972 OK CR 82, 495 P.2d 407, PIERCE v. STATE
Discussed
 1984 OK CR 1, 674 P.2d 48, DOLLAR v. STATE
Discussed
 1984 OK CR 32, 675 P.2d 1023, FERGUSON v. STATE
Discussed
 1985 OK CR 22, 695 P.2d 879, HENDERSON v. STATE
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2105, Preliminary Questions
Cited
 12 O.S. 2404, Character Evidence Not Admissible to Prove Conduct - Exceptions - Other Crimes
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 701.7, Murder in the First Degree
Cited
 21 O.S. 701.8, Second Degree Murder
Cited
 21 O.S. 1283, Convicted Felons and Delinquents
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 991a, Sentence - Powers of the Court
Cited
 22 O.S. 991f, Definitions
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA